CLARENCE M. BURTON v. THOMAS P. TUITE.

*Public records and files—Right of the public to examine—Dealers in information—Public character of city tax records.*

1. Sales-books kept by the receiver of taxes, containing a statement of the sale of delinquent tax lands, and by him turned over to the city treasurer, who minutes therein redemptions or sales of city bids, are public records within the meaning of Act No. 205, Laws of 1889, providing for the inspection of records and files in public offices.

2. A city can have no private books, not even of accounts, not open to the inspection of its citizens.    Its doings, and the

doings of its officers, and the records and files in their offices, must be open to the public; nor can fees be charged for such inspection to those having the right to examine and inspect such files and records.

3. The Legislature intended to assert, by Act No. 205, Laws of 1889, the right of all citizens, in the pursuit of a lawful business, to make such examinations of the public records in public offices as the necessity of their business might require, subject to such rules and restrictions as are reasonable and proper under the circumstances.

*Mandamus.*   Submitted October 25, 1889.   Granted December 28, 1889.[1]

Relator applied for *mandamus* to compel respondent, as city treasurer, to allow him to examine, and have access to, certain records in said treasurer's office.   The facts are stated in the opinion.

*Henry A. Chaney* (*Hoyt Post,* of counsel), for relator.

*John W. McGrath* (*E. Minock,* of counsel), for respondent.

MORSE, J.   The relator asks for the writ of *mandamus* to compel the respondent to permit him to inspect and examine the records and files in the city treasurer's office at Detroit, and to furnish proper and reasonable facilities for such inspection and examination, and for making memoranda and transcripts from such files and records, in compliance with Act No. 205, Laws of 1889.   The act in question reads as follows:

"That the officers having the custody of any county, city, or town records in this State shall furnish proper and reasonable facilities for the inspection and examination of the records and files in their respective offices, and for making memoranda or transcripts therefrom,

---

[1] Respondent was afterwards adjudged guilty of contempt of this Court, by disobedience of its writ of *mandamus,* and fined.   See *Burton v. Tuite,* 45 N. W. Rep. 88.

during the usual business hours, to all persons having occasion to make examination of them for any lawful purpose: *Provided,* that the custodian of said records and files may make such reasonable rules and regulations with reference to the inspection and examination of them as shall be necessary for the protection of said records and files, and to prevent the interference with the regular discharge of the duties of such officer: *And provided, further,* that such officer shall prohibit the use of pen and ink in making copies or notes of records and files."

Relator shows in his petition that he is engaged in the abstract business in the city of Detroit, and has invested a large sum of money in said business. That his business requires that he should know what taxes, levied by the city of Detroit, are liens upon property of which he is furnishing abstracts, and by whom such liens, if any, are held. That when lands are sold for unpaid taxes the sale is conducted by the receiver of taxes. A statement of such sales in book form is made by the receiver, and turned over to the city treasurer, in whose custody it thereafter remains. When sales are redeemed or city bids sold, such redemption or sale is minuted in this book. That it is necessary in said relator's business to frequently consult this book. If proper facilities were granted him, he would not need to consult the same more than 10 minutes in any one day. That the prevailing rule and custom is, in all the city and county offices, to permit all persons to have free access to the records therein, and he himself has ordinarily been allowed this privilege without obstruction or restraint, except in the case of the respondent, who is city treasurer of the city of Detroit.

That said respondent has frequently refused to permit your relator to inspect the sales-book above referred to, as have also his subordinates; and, if at times an inspection of such records has been granted, it has always been accompanied with insulting language, implying that relator

was taking time which belonged to the public, and that he must hurry, or that the books would be taken from him; and this, too, although no other parties were present to be waited upon or attended to, and though much more time was consumed by said treasurer in making such complaints than would be necessary for relator to inspect and make such memoranda as he needed if he could have access to the records without unreasonable interruption. A clerk would be detailed to see that the relator did not mutilate the records, with instructions not to permit relator to take the books. But more frequently relator has been told by said city treasurer and his subordinates that he could not see the records. Respondent has followed this obstructive course for a long time, to the great annoyance and discomfort of relator, and in face of the fact that there was posted in his office a notice to the effect that all information desired by the public would be promptly and cheerfully furnished. That respondent at one time informed relator that it was a matter of money with him, and that, if relator would pay him $25 per month, relator could have what access he pleased to the records in said treasurer's office.

July 2, 1889, relator called at the treasurer's office, at about 11 o'clock A. M., and requested the privilege of inspecting some of the sales-books. Respondent asked if the information wanted was for relator's private business. Relator replied that Richard M. Coon was the owner of lot 24, in Wesson's section of the Thompson farm, in the city of Detroit, and that he had employed relator to see if certain tax sales which had been previously made were still held by the city or disposed of, and, if disposed of, to whom. Respondent requested relator to write out what he wanted on a piece of paper, which he did. The paper was handed to a clerk, who was called

by respondent to wait on relator. The parcel of land had been sold for six successive years, and it became necessary to inspect six different sales-books. That the statement which relator had made for the clerk, a copy of which he retained, informed the clerk the number of the book required, the page of the book, and the line on the page which he desired to inspect. That said clerk produced four of the books required, and they were hastily inspected by relator, but he was not permitted to handle them. During the examination, which could hardly have occupied ten minutes, respondent himself sat by, discussing the general subject of relator's rights, and apparently in no wise hurried by the pressure of official duties. That, after relator had inspected the fourth volume, said clerk,—taking his cue from the language and actions of his employer, said respondent,—abruptly, violently, and unreasonably refused to produce the other two books requested, and left the room. That relator then asked the city treasurer himself to produce the two books asked for, but said treasurer refused. Relator then told respondent that he would get the books himself if he (respondent) would permit him (relator) to go into the room where said books were, for that purpose. Respondent told him he could not go into that room, and absolutely refused to permit him to see the books he desired. Relator offered respondent ten dollars per month to be accorded such treatment as is accorded to the public. Respondent refused the offer. Relator then formally demanded the right to inspect the two books he had asked for before, and reminded respondent of the statute. Relator said that if he could not see the books he should ask for a *mandamus*. Respondent told relator to "mandam" if he wanted to; that the books were in the vault, and relator could not see them; and that nothing but an order from the common council would make him remove

them. He told relator to leave a written memorandum of what he wanted, and relator refused to do this, as he had already furnished respondent with one statement of what he required. Respondent became vociferous, declared that he had disposed of the subject, refused to hear anything further, and left the room.

Relator then, under advice of counsel, made a new memorandum of what he wanted, and offered it to the deputy treasurer, who said he had no time to attend to it. Relator told him he need not attend to it then, as he would send his clerk for it; laid the memorandum on the table, and placed a paper-weight upon it. Respondent came in about then, in a high temper, and with some profanity ordered the relator out of the office, which order relator obeyed. During the whole time of this interview there was no other person in the office on business, unless he was secluded in the private office of respondent.

The respondent in his answer denies that the books referred to by relator are public records, or that they are made so by charter, ordinance, or law, or that they are required by law to be kept, or that relator, or any person except respondent, is entitled to the possession of said books or entitled to take them out of the custody of respondent, or to make extracts from them, except under the immediate supervision of respondent. He denies that it is the universal practice in city offices to permit all persons desiring to inspect the said books to have free access to them, or that such is the usage, or that such usage has become so well established as to have the force of a common-law custom. He denies that relator has been ordinarily allowed to inspect such books, without obstruction or restraint, if by obstruction or restraint is meant a denial of the right of access to said books without the supervision of the city treasurer. He denies that

the right which relator seeks to establish is recognized or confirmed by any act of the Legislature. He denies that at any time this respondent, or, by this respondent's direction or authority, any deputy or clerk in respondent's office, has accompanied any inspection of the books which relator has been allowed to make with insulting language. He denies that relator has been told by respondent that he (the relator) could not see the records. He denies that respondent has been guilty of obstructing relator. He denies that respondent derives an income from abstracts amounting to $1,000 per annum, or any such sum. He denies that this respondent has ever said that if relator would pay respondent $25 per month during his term of office the relator could have whatever access he desired to the books in respondent's office. He denies that he made use of the expression found on page 9 of relator's petition, viz.: "God damn quick, too."

Respondent also sets forth in his answer that relator is seeking the information from the books as a matter of merchandise to sell to others. That up to July 1, 1884, abstracts could only be procured of the city treasurer, and that the treasurer whose office expired in 1884, realized from $1,500 to $2,000 annually from tax abstracts, and that he is informed relator paid such officer for the privilege of making a copy of the books of said office, and did make and use the same for private gain. That for one year prior to July 1, 1888, relator paid $35 per month for this privilege. That respondent has always been ready and willing to give any lot-owner or citizen desiring it information as to tax charges upon lands, and has always done so free of charge. Insists that he has legal right to charge a small fee for making out abstracts, as there is no law requiring him to make them otherwise.

That the books in question have been kept for the information and convenience of the city of Detroit, and

are not required to be kept by the city charter or any law or ordinance. That each year, after the receiver of taxes makes sale of lands for unpaid taxes, one of said books is made up by such receiver, and entered therein is the name of the owner, if known, a description of each parcel of land, the amount of the city tax, school tax, etc., the total tax, the name of the person to whom sold, which is usually the city of Detroit; and said books also contain blanks for entry of assignment or redemption. There are in all 37 books, containing from 100 to 250 pages each. In addition, there are some sales-books, containing memoranda of sales for unpaid special assessments. There are also 16, one for each ward, indexes to sales-books, each of which contains a description of each parcel of land in that ward, with a column for each year in which to enter, if sold, the number of the page of the sales-book for that year containing the memoranda of the sale. If a sale has been canceled, a red ink line is drawn through the reference figures. That the books so kept are easily subject to alteration or defacement. That the books aforesaid are valuable, and the loss of the same, or any of the same, would be irreparable. That respondent is charged by the city with the care and custody of the same. That a portion of respondent's office is kept for the use of the public, and the public is necessarily, by means of desks, railings, and wire-work partitions, excluded from the private or working department of the office, and from the part containing the moneys, books, and papers in respondent's office. That relator, in order to use the right which he here seeks to establish, must necessarily be admitted to that portion of respondent's office from which the general public is excluded. That the books referred to are kept by respondent in a vault in the city treasurer's office, and in the same vault are other valuable books and papers, together with large

sums of the city moneys, varying in amount from $100 to $30,000. That to produce said books, and a number of them, as is often required by relator, requires a large amount of time almost daily, and from 10 to 30 minutes per day have often been consumed in so doing. That respondent insists that it is the duty of respondent, in order to protect himself and his bondsmen, to keep their books under the immediate care, custody, and supervision of himself, or one of his trusted employés. That during the month of July relator's purpose is not so much to look after individual cases of sales, as it is to compare his minutes of sale with the office memoranda of the same.

Respondent submits that he is not obliged to produce the books of his office, and supervise the inspection of the same, to one who is collecting information for merchandise, and that, if he does do so, he is entitled to pay for it. He also submits that in other public offices,—in the office of register of deeds, in the probate court, and in the county clerk's office,—when information is furnished which the law does not require to be furnished, charges are made, and legitimately, for such information. He also shows that he has given bond for the safe-keeping of these records. That his total fees for abstracts for 11 months ending December 31, 1888, were but $243. And he finally submits that relator is not entitled to access to the books of respondent's office at his own pleasure, neither is he entitled to frequent or enter into that portion of respondent's office from which the general public is excluded. That respondent is entitled to supervise the examination of the books in his office, and that the relator, as a dealer in information, is not entitled to compel respondent to give his time to relator, at the pleasure of relator, for his gain, and without compensation to respondent.

It is evident, from the petition and answer, that there is more or less of ill feeling between these parties, and it is also clear that the relator has been in fact denied free access to these sales-books, and that the respondent does not propose to permit such access unless he is paid therefor; nor does he propose to furnish any facilities, reasonable or otherwise, to the relator to inspect and examine said books without pay.

This right of relator, claimed under the statute, is denied, first, on the ground that these books are not public records, because there is no express statutory provision anywhere that such books shall be kept. These books are made up in the first place by the receiver of taxes, and by him handed over to the city treasurer. They are therefore books used and kept in two of the public offices in the city of Detroit, and they must be considered public records. The claim that they are private books of account is absurd. They are neither the private books of the receiver of taxes or of the city treasurer, and the city of Detroit, a public municipal corporation, can have no private books, not even of accounts, not open to the inspection of its citizens. Its doings, and the doings of its officers, and the records and files in their offices, must be open to the public; nor can fees be charged for such inspection to those having the right to examine and inspect such files and records.

But the broad ground is also taken that the relator has no lawful right to inspect these sales-books, without recompense to the respondent, because he is an abstract maker, and his business may be, and is in most cases, to sell some person the information gained by such examination; that he does not come under the statute, because he does not have "occasion to make examination of them for a *lawful* purpose," and that this case is covered and against relator by two former decisions of this Court:

*Webber v. Townley,* 43 Mich. 534 (5 N. W. Rep. 971); *Diamond Match Co. v. Powers,* 51 Id. 145 (16 N. W. Rep. 314).

If I understand the latter case, the writ of *mandamus* was denied because the Diamond Match Company was not a citizen, nor an inhabitant, nor even a domestic corporation. It did not show its charter, nor give any evidence of its powers or artificial capabilities. This Court say:

" We have no means of knowing that it has capacity to buy or hold lands or deal in titles anywhere, or to carry on the business in which its petition alleges it to be engaged, or to apply itself to such an enterprise as making a system of abstracts of all the titles of all the real property in a county. The case is bare of information in regard to the true legal *status* of the relator, and as to whether it is other than a mere intruder in what it now demands."

The petition of the relator alleged that it was incorporated under the laws of the state of Delaware; that it had become the purchaser of about 30,000 acres of pine land in the county of Ontonagon, had erected extensive saw-mills, and invested nearly $200,000, and was cutting large quantities of pine, and constantly purchasing more land; and, to provide against acquiring defective titles, desired to protect its rights and interests by providing for itself an abstract of all the lands in the county. The relator was permitted opportunity to examine and make abstracts, as far as its own ownership or interests was concerned, present or prospective; but the dispute was whether it had the right to go further, and insist on having office accommodations, and the handling of all the records, to make an abstract of title to all the lands in the county. While the writer of the opinion, Chief Justice GRAVES, paused to make some practical suggestions of obstacles in the way of proper relief being afforded by *mandamus,* the ground of the denial of the writ was that

the relator had failed to show any title to the right it claimed, because the authority given to it by the state by which it was created was not disclosed, and could not be assumed.  See *Diamond Match Co. v. Powers*, 51 Mich. 147, 148.

In this view of the case above cited, I do not think that it is any authority bearing against the relator's claim in this case.  And I cannot agree with the opinion of this Court, or the reasons given for it, in *Webber v. Townley, supra;* nor do I anticipate that hardly any, if any, of the results imagined by the writer of that opinion would ever occur, if the holding were otherwise.  If any of them should happen, the law is powerful enough to remedy them, and "sufficient unto the day is the evil thereof."  I do not think that any common law ever obtained in this free government that would deny to the people thereof the right of free access to, and public inspection of, public records.  They have an interest always in such records, and I know of no law, written or unwritten, that provides that, before an inspection or examination of a public record is made, the citizen who wishes to make it must show some special interest in such record.  I have a right, if I see fit, to examine the title of my neighbor's property, whether or not I have any interest it, or intend ever to have.  I also have the right to examine any title that I see fit, recorded in the public offices, for the purposes of selling such information, if I desire.  No one has ever disputed the right of a lawyer to enter the register's office, and examine the title of his client to land as recorded, or the title of the opponent of his client, and to charge his client for the information so obtained.  This is done for private gain, as a part of the lawyer's daily business, and by means of which, with other labors, he earns his bread.

Upon what different footing can an abstractor—can

Mr. Burton—be placed, within the law, without giving a privilege to one man or class of men that is denied to another? The relator's business is that of making abstracts of title, and furnishing the same to those wanting them, for a compensation. In such business it is necessary for him to consult and make memoranda of the contents of these books. His business is a *lawful* one, the same as is the lawyer's, and why has he not the right to inspect and examine public records in his business as well as any other person? If he is shut out because he uses his information for private gain, how will it be with the dealer in real estate, who examines the records before he buys or sells, and buys or sells for private gain? Any holding that shuts out Mr. Burton from the inspection of these records for this reason, also shuts out every other person except the buyer, seller, or holder of a particular lot of land, or one having a lien upon it, or an agent of one of them, acting as such agent without fee or reward. It cannot be inferred that the Legislature intended that this statute should apply only to a particular class of persons, as, for instance, those only who are interested in a particular piece of land. "Any person" means all persons.

I can see no danger of great abuses or inconveniences likely to arise from the right to inspect, examine, or make note of public records, even if such right be granted to those who get their living by selling the information thus gained. The inconvenience to the office is guarded against by the statute, which authorizes the incumbent to make reasonable rules and regulations with reference to the inspection. And when abuses are shown there will no doubt be found by the Legislature or the courts a remedy for them. It is plain to me that the Legislature intended to assert the right of all citizens, in the pursuit of a lawful business, to make such examinations of

the public records in public offices as the necessity of their business might require, subject to such rules and restrictions as are reasonable and proper under the circumstances. The respondent in this case is the lawful custodian of these sales-books, and is responsible for their safe-keeping, and he may make and enforce proper regulations, consistent with the public right, for the use of them.

" But they are public property, for public use, and he has no lawful authority to exclude any of the public from access to and examination and inspection thereof at proper seasons." *Lum v. McCarty, infra.*

It follows that he has no right to demand any fee or compensation for the privilege of access to the records, or for any examination thereof not made by himself or his clerks or deputies. He has no exclusive right to search the records against any other citizen. *Lum v. McCarty,* 39 N. J. Law, 287; *Boylan v. Warren,* 39 Kan. 301 (18 Pac. Rep. 174); *State v. Rachac,* 37 Minn. 372 (35 N. W. Rep. 7); *People v. Richards,* 99 N. Y. 620 (1 N. E. Rep. 258); *Hanson v. Eichstaedt,* 69 Wis. 538 (35 N. W. Rep. 30.[1])

It follows, in my opinion, that the prayer of the petitioner must be granted, and the writ issue as prayed, the relator asking in this writ no more than the statute gives him.

CHAMPLIN, J., concurred with MORSE, J.

CAMPBELL, J. I think relator has such an interest as entitles him, under the Laws of 1889; to see the book in question, and confine my opinion to that point.

SHERWOOD, C. J., and LONG, J., did not sit.

---

[1] Cited by relator's counsel.