In the Matter of Helen Cherkis, Respondent, against Vincent R. Impellitteri, as Mayor of the City of New York, Appellant.

First Department, October 6, 1953.

*Bernard Friedlander* of counsel (*Seymour B. Quel, W. Bernard Richland* and *Barbara Carroll* with him on the brief; *Denis M. Hurley, Corporation Counsel,* attorney), for appellant.

*Howard M. Squadron* of counsel (*Lois Waldman* with him on the brief; *Phillips, Nizer, Benjamin & Krim,* attorneys), for respondent.

*Per Curiam.* The question on this appeal is whether a report made to the Mayor of the City of New York by the Commissioner of Investigation is excepted from the public scrutiny of public documents provided by sections 893 and 894 of the City Charter under the clause of said sections excepting " papers prepared    *    *    * by or for counsel for use in actions or proceedings to which the city or any agency is a party or *for use in any investigation authorized by this charter.*" (Italics ours.)

We agree with appellant's contention, as a matter of construction, that the exemption of papers for use in an investigation is not connected with or dependent upon the preceding

reference to papers prepared by counsel, and that papers prepared for use in an investigation are exempt whether or not prepared by counsel. We think, however, that a final and formal report of the Commissioner of Investigation is not a paper for use in an investigation. There are obvious distinctions between papers for use in an investigation and a culminating official report at the conclusion of the investigation. That the papers are free from disclosure does not compel the conclusion either in public policy or legal construction that the final report should be.

The broad policy in favor of openness, with the only limited and specified exceptions, is enunciated in the Charter. With due appreciation for the reasons which might suggest a legislative policy extending the exception to reports of the Commissioner of Investigation, we do not feel warranted in making the extension as a matter of judicial construction. The order appealed from should be affirmed.

BREITEL, J. (dissenting). Petitioner, a taxpayer, seeks in a proceeding under article 78 of the Civil Practice Act to compel the Mayor of the City of New York to disclose to her a report made to him by the Commissioner of Investigation concerning certain charges against the City Commissioner of Correction.

Special Term in a learned opinion held that under section 894 of the New York City Charter the report in question was not exempt from public inspection. The issue is whether the provision in section 894 exempting papers '' prepared by or for the comptroller for use in any proceeding to adjust or pay a claim against the city or any agency or by or for counsel for use in actions or proceedings to which the city or any agency is a party or for use in any investigations authorized by this charter '' precludes mandatory disclosure of the report on demand of a taxpayer. I believe that it does. It is clear that under sections 893 and 894 of the New York City Charter and under section 51 of the General Municipal Law, papers, books, accounts, records and documents of municipal departments and agencies generally are open to public inspection. The mandate of the statutes is of a most sweeping character. The question is what is excepted from this sweeping mandate with respect to papers and documents developed in investigations authorized by the Charter.

The proviso quoted, insofar as it relates to investigations, was added to the Charter in the 1938 revision. Consequently, the few cases, and they are few, that arose prior to 1938 are

of limited application. The legislative history in connection with the inclusion of the clause relating to investigations is at best ambiguous as to precisely what papers or records were intended to be excluded from public inspection at the demand of a taxpayer.

The two significant earlier cases prior to 1938 held that testimony taken by the predecessor of the Commissioner of Investigation, the Commissioner of Accounts, was not subject to mandatory public inspection (*People ex rel. Woodill* v. *Fosdick,* 141 App. Div. 450), and that findings and conclusions by the Commissioner of Accounts were subject to such mandatory public inspection (*Matter of Blanshard* [*O'Brien*], N. Y. L. J., Dec. 6, 1933, p. 2113 [COHN, J.]).

In the Preliminary Report and Draft of Proposed Charter for the City of New York (1936), prepared by the Charter Revision Commission, the quoted proviso made no reference to investigations. It then read: " This provision shall not apply to any papers prepared by or for counsel for use in actions or proceedings in which the city is a party " (pp. 187–188). In the final draft there were added at the end the words in issue here, " or for use in any investigation authorized by this charter ".

The investigation of the City Commissioner of Correction, with which we are concerned, was not in a litigated action or proceeding. It is also clear that it was an investigation authorized by the City Charter.

It is quite reasonable to read the words " by or for counsel " to limit its reference to " actions or proceedings ", using those latter words in their ordinary meaning as referring to actions or proceedings in litigation. The purpose is evidently to exclude from mandatory public inspection the so-called " work papers " of lawyers in connection with litigated proceedings. There is no reason, historically, in language usage, or in logic, to relate to each other the terms counsel and investigations. It does not necessarily follow that investigations are conducted by those having the title, the description, or even the status of counsel.

Since 1938, the only case called to our attention involving the issue of mandatory public disclosure is the unreported one of *People* v. *Mullens* (1941) in the Court of General Sessions. In that case counsel for defendants in a criminal case were voluntarily given — and therefore without the issue here being raised or considered — the final report by the City Commissioner of Investigation. Objection by the city to disclosing the underlying

report by the departmental examiner to the Commissioner of Investigation was sustained by the trial court.

There is no point in adverting to the many cases involving mandatory disclosure of other records of other agencies of the city government or of investigations not authorized by the Charter. There is no longer any doubt that such records are subject to mandatory public inspection and that the mandate cannot be frustrated by claims of confidential communication (*Matter of Egan,* 205 N. Y. 147). Nor is it material to consider the clear and expressed exception with regard to police and law department records covered in sections 893 and 894 of the City Charter.

The issue thus viewed becomes a narrow one. It is submitted that the phrase " for use in any investigation authorized by this charter " relates back solely to the word " papers " and is not to be deemed modified by the words " by or for counsel ", and those that follow. The punctuation does not indicate such modification. The legislative history does not intimate such modification. The ordinary unlabored reading of the sentence does not suggest such modification. More importantly, in view of the public policy question present, such modification should not be implied unless the legislative intent and its expression are clear and unambiguous.

It is pertinent to discuss the policy involved. It is quite clear that all the documents and records pertaining to the direct or line functions of municipal government, with the exceptions noted, are subject to mandatory public inspection. Such inspection was one of the answers, hopefully made, to the problem of recurring municipal corruption. No similar policy is general with regard to investigations of individual wrongdoing or public malfunction. On the contrary, the Grand Jury proceeding is painstakingly secret. Only the public presentment, and that in a limited character, and then at the option of the inquiring body, is made public (see, e.g., *Matter of Wilcox,* 153 Misc. 761 and the authorities cited therein). It is axiomatic that the best investigations do their work in private and expose to the public eye either proven charges or accusations subject to litigated defense by those accused. None would contend that reports under section 6 of the Executive Law (the so-called Moreland Act) are subject to mandatory public inspection, or that it would be desirable to so subject them. The new statute setting up a State commissioner of investigation provides: " Any person conducting or participating in any examination or investigation who shall disclose to any person other than the governor or

the commissioner the name of any witness examined, or any information obtained or given upon such examination or investigation, except as directed by the governor, shall be guilty of a misdemeanor '' (L. 1953, ch. 887; Executive Law, § 11, subd. 5). The effect of that section is to negative mandatory disclosure of the report finally submitted.

It is no answer to say that the evils that may flow from mandatory disclosure of reports on unfounded charges can be avoided by the report-maker eliminating such dangerous material. That becomes advice — of doubtful propriety — to the report-maker not to make a full report. Under those circumstances, assuming that the final reports are subject to disclosure, then certainly the underlying reports should be equally available if hollow fraud is to be avoided. Moreover, it is no answer to suggest that when an investigation is completed that then there is no harm in yielding up the final report. It would still make possible the publication of unfounded charges that are not negatived by the nonjudicial, unilateral and ex parte determination by the Commissioner of Investigation purporting to exculpate. The evil would be as great as that of the Grand Jury presentment that accuses, unilaterally and ex parte, but does not indict, thus giving the accused no opportunity to refute the charges. And we should note, too, that we are dealing with reports that are probably privileged as necessary in the performance of governmental function. Nor is it an answer, as suggested by the learned Special Term, that the mandatory disclosure is subject to judicial supervision. It is no answer because the very question is whether the power and responsibility is political and executive and should reside with the city administration. That is one of the reasons, borne out by legislative history, that the Commissioner of Investigation is an appointive officer selected by the Mayor. For unjustified suppression of a report the Mayor is answerable to the electorate. He is answerable to the electorate in the same way that a Governor of the State is answerable to the electorate if he investigates, exculpates and fails unjustifiably to disclose to the public the basis for the exculpation. Where there is a general public demand for a report it will be the rare public official who will be able, with political impunity, to withhold such report, unless he can truly justify a suppression.

Thus, in the instant case the accusations against a City Commissioner of Correction were that he favored a notorious and powerful gambler who was in the commissioner's charge as a prisoner; that there was a waste of city property; and that he

was guilty of anti-Semetism in the handling of subordinates. There is no reason why the investigation made of such charges should be available to an individual taxpayer. It may well be, and properly so, that such a report is of broad enough interest to be made available to the public at large. That is a political decision to be made by the chief political officer of the city. He will answer, at his political peril, for the decision he makes.

It is of great significance, it seems to me, that the Committee on Municipal Affairs of the Association of the Bar of the City of New York, in November, 1952, considered the very question whether there should be (not whether there was!) a legislative requirement that the reports of the Commissioner of Investigation be public documents. The committee said that it " would tend to hamper unduly the proper functioning of his Department. In many cases, it appears that inefficiency would be corrected by proper action by the Mayor without the loss of morale which would inevitably follow publication. Moreover, it might well be that erroneous, trivial, or incompletely explored information might be unfairly exploited by political opponents ". (Record of Association of Bar of City of New York, Vol. 7 [1952], p. 508.) The committee went on to say: " The problem of actual suppression of reports can best be dealt with by the nomination and election of public officials having a proper regard for their duties " (p. 508). The membership of the committee which made the report is a distinguished one and includes a sizeable number of persons who in private life and in public office have been in the forefront of charter revision and municipal reform movements.

It is emphasized that existing statutes, in broadest fashion, and with but narrow exception, subject direct or line functions of the city government to public inspection, examination and even extensive investigation. It is not suggested that this broad visitorial power be curtailed. It is suggested that the internal investigation by the city administration of itself or of any of its parts was not intended to be subject to this broad power. Indeed, were all administration reports of efforts to do its own housecleaning subject to mandatory inspection at any citizen's demand, would this not become a deterrent? It would be safer " to let sleeping dogs lie " and investigate only when forced from without and when the damage is already incurred. The office of Commissioner of Investigation, the legislative history shows, exists to help the Mayor run the city with efficiency and honesty, and to deprive him of an excuse for not doing so (Seidman on Investigating Municipal Admin-

istration [1941], pp. 5–10, 37–40, 52–53; Record of Association of Bar of City of New York, Vol. 7 [1952], p. 507). Had the purpose been otherwise, namely, to act as an external check on the Mayor's administration, the incumbent would not be an appointee of the Mayor.

It is particularly noteworthy that despite the many turbulent incidents during the years since the 1938 Charter revision resulting in many investigations by the city Commissioner of Investigation, this is the first time the issue raised here has been tendered, and there has been no end of reports to the Mayor.

The majority of this court distinguished the final report from the intermediate work of the investigation. The statute makes no such distinction, unless one argues that the words " papers * * * for use in any investigation " do not include a " report ". Moreover, the nature of an investigation for purposes of internal administration in a government need not result in reports of a " final and culminating " nature. They may be tentative. They may have recommendations relating to a period of time to come. They may have alternatives. They may suggest culpability but lack sufficient proof coupled with a comment that a repetition, if it should occur, of the wrongdoing should be awaited before there be a taking of drastic action.

The issue of interpretation being a close one, the policy being arguable, the question of mandatory public disclosure of reports of the city Commissioner of Investigation should be left to legislative action if that be advisable.

The order of Special Term should be reversed and the motion to dismiss the petition granted.

PECK, P. J., GLENNON, COHN and BOTEIN, JJ., concur in *Per Curiam* opinion; BREITEL, J., dissents and votes to reverse and dismiss the petition in opinion.

Order, so far as appealed from, affirmed, with $20 costs and disbursements to the respondent. [See *post,* p. 874.]