Argued September 15, 1960, reargued January 11, reversed and
remanded February 1, 1961

MacEwan *v.* HOLM et al

359 P. 2d 413

*Reuben G. Lenske,* Portland, argued the cause and submitted a brief for appellant.

*Floyd A. Fredrickson,* Portland, argued the cause for respondents. On the brief was H. Lawrence Lister, Portland.

Before McALLISTER, Chief Justice, and ROSSMAN, WARNER, PERRY, SLOAN, O'CONNELL and GOODWIN, Justices.

O'CONNELL, J.

Plaintiff brings this suit to require the defendants, who constitute the State Board of Health, to make available to the plaintiff data requested by him relating to nuclear radiation sources which defendants had collected in the course of carrying out their duties under ORS ch 453. Plaintiff appeals from a decree granting defendants' motion to dismiss.

Under ORS ch 453 enacted in 1957, the State Board of Health is charged with the duty of making a two-year study relating to radiation sources, after which

it is required to "promulgate regulations and standards, in conformance with the policy expressed in ORS 453.620, for the safe use, handling, disposal and control of all radiation sources within this state * * *."

The Board was directed to promulgate the regulations and standards in conformance with the declaration of policy stated in ORS 453.620, which reads as follows:

"*453.620 Declaration of public policy.* Whereas radiation can be instrumental in the improvement of health, welfare and productivity of the public if properly utilized, and may impair the health, welfare and productivity of the public and the industrial and agricultural potentials of the state if improperly utilized, it hereby is declared to be the public policy of this state to encourage the constructive uses of radiation and to control any associated harmful effects."

The Board was also directed to appoint a Radiation Advisory Committee to advise it "on matters relating to radiological health and radiation protection."

At the time plaintiff made his request for the data relating to radiation, the defendant had begun making tests to determine the amount of radioactive materials in the air. Defendants admitted in their answer to plaintiff's complaint that they had "collected certain data designed to aid in determining the amount of radioactive material in the air and that defendants keep certain records."

On April 22, 1958, plaintiff began his effort to obtain information from the Board. He first went to the Board's Portland office where he was referred to Dr. Sullivan, Director of Occupational Health. Dr. Sullivan was not in his office at the time but plaintiff made his request known to Mr. Moser, a chemist

employed by the Board. Moser showed plaintiff the apparatus which was used to capture and count radioactive particles but plaintiff obtained no data in that conference. Plaintiff was then referred to Mr. Lamb, the administrative assistant to Dr. Harold Erickson, State Health Officer. Plaintiff testified that Lamb informed him that the Board had data on the amount of radioactive substances in the air and in rain water and that this information was available to the public but that it could be obtained only upon a written request.

On April 24, 1958, plaintiff wrote the first of a series of letters requesting information from the Board. In his first letter, which was addressed to the Director of Sanitary Engineering and delivered by plaintiff to Mr. Hatchard, an engineer in the Board's office, he asked for the Board's published report on radiation, or if the report was not available then the opportunity to examine the Board's findings. Mr. Hatchard informed plaintiff that his letter would be answered by Mr. Lamb. On May 12, 1958, having received no response to his letter of April 24, plaintiff mailed a letter to Mr. Lamb asking for a reply to his request for information. On the same day plaintiff received the following letter:

"*    *    *    *    *

"Dear Mr. MacEwan:

"The Oregon State Board of Health has been periodically collecting air or rain water samples for radioactivity measurements at the Portland station since May 1956 through participation in the Radiation Surveillance Network. These samples are submitted to the Public Health Service Radiological Health Laboratory in Washington, D. C. and consolidated reports of measurements for all stations are prepared.

"We do not have available published extracts for the Portland station and the Network instructions prevent the release of any data obtained from sampling stations located in other states.

"We regret that staff limitations prevent the preparation of an individual report for your use. However, the State Board of Health does make informational releases whenever minor variations in the radiation measurements occur.

> "Very truly yours,
>
> "[signed] H. M. Erickson
> "HAROLD M. ERICKSON, M.D.
> "State Health Officer"

On May 14, 1958, plaintiff wrote to Dr. Erickson referring to plaintiff's original letter in which he requested the opportunity to examine the Board's findings on radioactivity. On May 21, 1958, plaintiff received the following reply:

"* * * * *

"Dear Mr. MacEwan:

"* * * I regret the delay in reply, but because of the importance of your request, I presented it to the State Board of Health at their recent meeting.

"The State Board of Health was sympathetic to your wishes, but after reviewing the basis on which our sampling station was established and our agreements with the United States Public Health Service in regard to release of information, the Board decided that your request could not be granted.

"The data involved is technical and must be interpreted to be of any value. I can assure you that according to the standards established by the United States Public Health Service, there have been no increases in radioactivity in the Portland area of sufficient magnitude to notify the Public Health Service.

"All health department records are not public, nor are they open to inspection by any citizen as are many governmental records. We regret that we cannot give you further information.

"Sincerely yours,

"[signed] Harold M. Erickson hd
"Harold M. Erickson, M.D.
"State Health Officer"

By letter dated June 19, 1958, plaintiff requested Dr. Erickson to send him a copy of the agreement between the Board and the United States Public Health Service relating to the release of information which was referred to in Dr. Erickson's letter of June 13. Plaintiff also requested Dr. Erickson to cite the statute which authorized the Board to withhold information from him.

On June 24, 1958, Dr. Erickson wrote to plaintiff stating that "Your * * * request and explanation of it will be called to the attention of the Board at its next meeting in late July, 1958." On August 10, 1958, plaintiff wrote again asking for a reply to his letter of June 24. He received a reply on August 13, 1958, which stated:

"* * * * *

"Dear Mr. MacEwan:
"* * * * *

"The Oregon State Board of Health, meeting August 1, 1958, again considered your request. It was decided that you should be offered the opportunity of a hearing before the Radiation Advisory Committee at their next meeting.

"The Radiation Advisory Committee is expected to meet in September. Please advise this office if you wish to appear before this committee and you

will be advised of the time and place, when that information is available.

"Sincerely yours,

"[signed] R. H. Wilcox
"for
"Harold M. Erickson, M.D.
"Secretary"

Plaintiff's final letter on August 28, 1958, read in part, as follows:

"* * * * *

"Dear Dr. Erickson:

"* * * * *

"It is now about four months since I first asked for the opportunity to see these records. For me to have a hearing before a committee of your board would serve no good purpose; it would only contribute to the already too long delay to which you have subjected me. I have asked Mr. Reuben Lenske to institute a mandamus proceeding for the Court to order you to make these records available to me.

"Sincerely yours,

"Alan M. MacEwan"

Plaintiff contends that since the data on radiation collected by defendants and similar data sent by the United States Public Health Service to the State Board of Health are compiled and tabulated in recorded form they are, therefore, a part of the public records of the state of Oregon. Plaintiff rests his claim of the right of inspection upon ORS 192.010 and 192.030. These sections provide as follows:

"*192.010 Right to inspect public writings.* Every citizen of this state has a right to inspect any

public writing of this state, except as otherwise expressly provided by statute."

"*192.030 Officers to furnish opportunities for inspection of records.* All officers having custody of any state, county, school, city or town records shall furnish proper and reasonable opportunities for inspection and examination of records and files in their respective offices, and reasonable facilities for making memoranda or abstracts therefrom, during the usual business hours, to all persons having occasion to make examination of them for any lawful purpose. The custodian of the records and files may make reasonable rules and regulations necessary for the protection of the records and files and to prevent the interference with the regular discharge of the duties of such officer."

At early common law the right to inspect public records was limited generally to those who could show a need for the information in maintaining or defending an action. *Nowack v. Auditor General,* 243 Mich 200, 219 NW 749, 60 ALR 1351 (1928); *North v. Foley,* 238 App Div 731, 265 NYS 780 (1933); *Nolan v. McCoy,* 77 R I 96, 73 A2d 693 (1950); Cross, The People's Right to Know, pp 25-26 (1953). Judicial decisions in some states have enlarged the right of inspection beyond such strict limits. *Nowack v. Auditor General,* supra; *Burton v. Tuite,* 78 Mich 363, 44 NW 282, 7 LRA 73 (1889), 80 Mich 218, 45 NW 88 (1890); *Higgins v. Lockwood,* 74 NJL 158, 64 A 184 (1906); Cross, *op. cit. supra,* pp 26-29. Our statutes referred to above grant the right of a reasonably conducted inspection without qualification, except that it must be for a "lawful purpose." The broad scope of these statutes is recognized in *State v. Keller,* 143 Or 589, 601, 21 P2d 807 (1933):

"* * * The public must always have access to all public records required to be kept or made

by a public official unless the statute specially provides otherwise."

See also, *Bend Publishing Co. v. Haner,* 118 Or 105, 244 P 868 (1926).

It is not contended in the present case that plaintiff's purpose in seeking information from the records was "unlawful." Defendants contend, however, that (1) the data which were being accumulated by the Board were not "public records" or "public writings" within the meaning of ORS 192.010 and 192.030, and (2) that even if the data can be regarded as "public records" there is no right to inspect such records because it is "otherwise expressly provided by statute."

■ The fact that ORS 453.630 provides that the Board shall conduct a two-year study of the problem of radiation before promulgating regulations and standards is relied upon by defendants as an express statutory provision denying the right of inspection. We cannot accept this interpretation. The statute contains no "express" provision limiting inspection and the mere postponement of the promulgation of regulations and standards until the completion of the study does not, in our opinion, impliedly limit the right of inspection.

■ The contention that the data do not constitute "public records" presents a more difficult question. It would serve no useful purpose to attempt to frame a general definition of a public record. Whether a record is to be regarded as a public record in a particular instance will depend upon the purposes of the law which will be served by so classifying it. A record may be a public record for one purpose and not for another. Thus a writing may be a public record for the purpose of making it admissible in evidence with-

out authentication, but not for the purpose of constituting constructive notice to a member of the public. Or it may be a public record sufficient to warrant judicial notice thereof, yet not be such a record as to require its retention under a statute permitting the destruction of certain records.

There are numerous cases defining the term public record for these various purposes. *Pruett v. Burr,* 118 Cal App2d 188, 257 P2d 690 (1953); *Amos et al. v. Mosley,* 74 Fla 555, 77 So 619 (1917); *Barnes v. Northwest Airlines, Inc.,* 233 Minn 410, 47 NW2d 180 (1951); *Banks v. Southern Potteries, Inc.,* 30 Tenn App 199, 204 SW2d 382 (1946) (admissibility in evidence without further authentication); *Larson v. Clough,* 55 N D 634, 214 NW 904, 54 ALR 752 (1927) (record as constructive notice); *Affonso Bros. v. Brock,* 29 Cal App 2d 26, 84 P2d 515 (1938); *Amos et al. v. Mosley,* supra (sufficient to permit judicial notice); *State v. Ramstad,* 135 Wash 346, 237 P 994 (1925) (whether within statute proscribing mutilation or destruction); *State of Oregon v. Brantley,* 201 Or 637, 271 P2d 668 (1954); *State v. McLaughlin,* 47 NJS 271, 136 A2d 22 (1957) (whether within criminal statute relating to falsifying public record); *Robison v. Fishback,* 175 Ind 132, 93 NE 666, 669, LRA 1917B 1179, Ann Cas 1913B 1271 (1911) (whether index system instituted by public official becomes a part of public records and thus ceases to be property of the officer).

It is apparent from an examination of these and other similar cases that the courts have not always been careful to key the definition of "public record" to the purpose for which the term is used in the particular instance, and frequently attempt is made to solve the problem of whether a record should be open to public inspection by applying a definition of "public

record" borrowed from cases involving questions other than the right of inspection. The cases most commonly relied upon in the inspection cases are those involving the admissibility in evidence of a record in the custody of a governmental agency. In admissibility cases it is proper to treat the writing as a "public record" if there is a reasonable assurance of its authenticity so that it may be safely used as evidence. The same considerations are not present where the question is whether the writing should be open to general public scrutiny.

■ Writings coming into the hands of public officers in connection with their official functions should generally be accessible to members of the public so that there will be an opportunity to determine whether those who have been entrusted with the affairs of government are honestly, faithfully and competently performing their function as public servants. *Nowack v. Auditor General,* supra. "Public business is the public's business. The people have the right to know. Freedom of information [about public records and proceedings] is their just heritage. * * * Citizens * * * must have the *legal* right to * * * investigate the conduct of [their] affairs." Cross, The People's Right to Know, p. xiii (1953).

■ And the public interest in making such writings accessible extends beyond the concern for the honest and efficient operation of public agencies. The data collected in the course of carrying on the business of government may be sought by persons who propose to use it for their own personal gain. Thus they may wish to obtain names and addresses for use as a mailing list, or the record of transfers of property to conduct a title insurance plant, or information for many other purposes. The data gathered by government are

available to its citizens for such private purposes. Under our statutes a person may inspect public records and files for a purely personal purpose; as we have indicated above, he need not show a special interest. *Burton v. Tuite,* supra. But cf., *Nowack v. Auditor General,* supra; Cross, The People's Right to Know, p 15 (1953).

█ Since the right of inspection under our statutes is intended to serve these broad purposes, the character of the writing which is subject to inspection is correspondingly broad. It is our view that these data, although informal, which serve the ends discussed above are subject to inspection and, for such purposes, are a public record.

We recognize that there are cases taking a narrower view. It is sometimes said (but usually in cases involving questions other than the right of inspection) that a writing is not a public record unless it is intended to serve as a memorial of some official action or, as it is frequently put, "as evidence of something written, said, or done," *State of Oregon v. Brantley,* supra, 201 Or at 646; *Amos v. Gunn,* 84 Fla 285, 94 So 615, 634 (1922); *Robison v. Fishback,* supra, 93 NE at 669; *Josefowicz v. Porter,* 32 NJS 585, 108 A2d 865 (1954); *Newspapers Corp. v. Hunter,* 127 W Va 738, 742, 34 SE2d 468 (1945); or that it is a writing prepared for the purpose of making information available to the public. *People v. Purcell,* 22 Cal App2d 126, 70 P2d 706 (1937); *People v. Harnett,* 131 Misc 75, 226 NYS 338, 341 (1927), affirmed 249 NY 606, 164 NE 602 (inspection of accident reports); *State ex rel Romsa v. Grace,* 43 Wyo 454, 5 P2d 301 (1931) (inspection of election affidavits).

It has been suggested that only writings representing "ultimate" official action should be regarded as

"public records" subject to inspection. In a review of Harold Cross' "The People's Right to Know," Judge Leon Yankwich expresses the view that "[o]nly documents which present ultimate actions should be accessible to the public. Those which are merely a part of the preliminary steps by which the conclusion was reached should become public *only in the discretion of the particular agency.*" 48 N W L Rev 527, 530 (1953). In accordance with this position it has been held that writings are not public records if they are "merely incidental to the administration of the affairs of office," *Steel v. Johnson,* 9 Wash2d 347, 356, 115 P2d 145 (1941). *Steiner v. McMillan,* 59 Mont 30, 195 P 836, 837 (1921) (admissibility of papers).

In a number of cases where, as in the case at bar, the information sought was preliminary data being gathered in the course of a study or investigation or used by the agency in carrying out its duties, it has been held that the writing was not a public record. *State ex rel Spencer v. Freedy,* 198 Wis 388, 223 NW 861 (1929) (reports made to fire marshal by those employed to investigate cause of fires—sought under discovery procedure); *Wiley v. Woods,* 393 Pa 341, 346, 141 A2d 844, 847 (1958) (notes of field investigation made by staff member of city planning department for purpose of record to city council member not within statute describing public records in terms of " 'resolutions,' 'transactions,' 'findings' or 'determinations' " and thus not open to public inspection); *Pruett v. Burr,* supra, (copy of letter and memorandum received by agricultural commissioner from Bureau of Chemistry relating to crop damage not public records as to be prima facie evidence of facts recited therein); *Conover v. Board of Education of Nebo School Dist.,* 1 Utah2d 375, 267 P2d 768 (1954) (untranscribed notes

of clerk of local board of education said not to be a "public writing" but held that transcript notes were open to inspection) ; *State v. Sheppard,* 100 Ohio App 345, 128 NE2d 471 (1955) (work sheets of technicians of coroner's office not admissible as public record in murder trial) ; *Allen v. Kidd,* 197 Mass 256, 84 NE 122 (1908) (assistant city engineer's notebook held not to be a public record—admissibility).

The foregoing cases are not directly in point on the question before us. In some of them the writing was offered in evidence in litigation and the restricted definition of "public record" can be justified on the ground that the writing lacked sufficient guarantee of authenticity. In *Wiley v. Woods,* supra, the only case where inspection was denied, the denial was based upon a statutory provision excepting the writing from inspection.

■ It is sometimes said that to constitute a public record the writing must be one which is expressly required or authorized to be kept by law. *Steiner v. McMillan,* supra; *Steel v. Johnson,* 9 Wash2d 347, 358, 115 P2d 145 (1941). According to the better view, where the issue is the availability of a writing for inspection, the writing need only constitute a "convenient, appropriate, or customary method of discharging the duties of the office" by the public officials. A writing need not be a document that is required by law to be kept as a memorial of official action in order to come within the definition of a "public record." *International Union v. Gooding,* 251 Wis 362, 371, 29 NW2d 730, 735 (1947). *People v. Shaw,* 17 Cal2d 778, 112 P2d 241, 259 (1941) (alteration of public records) ; *People v. Purcell,* supra (admissibility); *Disabled Police Veterans Club v. Long,* 279 SW2d 220, 223 (Mo 1955) (inspection) ; *Conover v. Board of Education of*

*Nebo School Dist.,* supra (inspection) ; *State v. Ewert,* 52 S D 619, 219 NW 817, 826 (1928) (admissibility). Thus it has been held that the names and addresses of disabled pensioners under a police retirement system were "public records" and subject to inspection. *Disabled Police Veterans Club v. Long,* supra. Similarly, the transcribed minutes of a local school board meeting prior to approval by the board were held to be a "public writing" in *Conover v. Board of Education of Nebo School Dist.,* supra. And in *International Union v. Gooding,* supra, a petition prepared by members of the public which had been submitted to a labor board was held to be within a statute permitting inspection of "official records."

In some cases writings made in the course of conducting the business of a governmental agency have been held subject to inspection on the ground that an applicable statute expanded the definition of "public records" or otherwise provided that the writings should be open to public inspection. Thus in *Connell v. Public Service Commission of New York et al.,* 152 Misc 242, 272 NYS 29 (1934), it was held that a statute which provided that "all proceedings of each commission and all documents and records in its possession shall be public records," did authorize the inspection of a process server's bill for services although the bill was not required to be filed but was kept solely for the information of the commissioner. And in *Coldwell v. Board of Public Works,* 187 Cal 510, 202 P 879 (1921), it was held that estimates, plans, drawings, maps and other data prepared by assistants of the city engineer for his approval in connection with the proposed construction of a municipal water supply system were not public records but were, however, subject to inspection under a statute making "other matters" available for

inspection. Nearly identical statutes were construed and applied in the same way in *Mathews v. Pyle,* 75 Ariz 76, 251 P2d 893, 896-897 (1952); the court held that a report submitted to the Governor by the Attorney-General was not a "public record," but did come within the statutory term "other matters."

■ We do not think that it is necessary to look outside of our statute (ORS 192.010 and 192.030) permitting the inspection of "any public writing" and "records and files" to authorize the inspection of tentative or preliminary data in the possession of a governmental agency. For the purpose of deciding whether a writing is subject to public inspection, we regard all data gathered by the agency in the course of carrying out its duties, irrespective of its tentative or preliminary character, as falling within the definition of "records and files." The need for data to serve the purposes we have mentioned above may be just as great when the data are in a raw or tentative state as when they are fully digested and memorialized by some ultimate official action. In some instances incompetence or dishonesty in public office may best be discovered at a preliminary stage when the officials in charge are merely preparing for final action. Likewise, from the standpoint of the use of the material by the citizen for his own private purposes, the raw data being gathered may be more helpful to him than the official conclusion summarized in a final report. The drawing of a distinction between writings representing tentative action and writings memorializing ultimate action is objectionable, not only because it is inconsistent with the principle which underlies our statutes making public writings freely available for inspection, but also because it provides a device by which a public official can hinder a citizen's legitimate attempt to obtain

writings which are clearly within the strictest definition of a public record.

■ The public's right of inspection is not without qualification. There may be circumstances under which the information contained in a record can be justifiably withheld from the person seeking it. Obviously, if it is shown that the information is being sought for an unlawful purpose, the request for it may be denied. ORS 192.030; *State v. Harrison,* 130 W Va 246, 43 SE 2d 214, 218-219 (1947) (dictum); *Payne v. Staunton,* 55 W Va 202, 46 SE 927, 932 (1904). Even where the request is made for a lawful purpose the public interest may require that the information be withheld. Thus where the information is received in confidence, it may be proper to refuse access to it. In *State ex rel Crummer v. Pace,* 121 Fla 871, 164 So 723, 102 ALR 748 (1935), it was held that the inspection of a municipal record was properly refused where it was received pursuant to a federal statute prohibiting disclosure. And in *City and County of San Francisco v. Superior Court,* 38 Cal2d 156, 238 P2d 581 (1952), confidential information furnished to a municipal corporation by some of its employees for the purpose of establishing rates of compensation was held to be nonaccessible. Similarly, in *Mathews v. Pyle,* supra, 75 Ariz at 81, 251 P2d at 897, it was held that a report of a state Attorney-General to the Governor was subject to inspection unless "confidential and privileged" or if "disclosure would be detrimental to the best interests of the state." See also, *Coldwell v. Board of Public Works,* supra. There are other circumstances which will justify nondisclosure. Thus it has been suggested that inspection may be denied where a citizen seeks documentary evidence in the hands of a district attorney, minutes of a grand jury, or evidence in a divorce

action ordered sealed by the court. See *International Union v. Gooding,* supra.

■ In any event the right of inspection cannot be exercised so as to unreasonably interfere with the business of government. *Direct-Mail Service v. Registrar of Motor Vehicles,* 296 Mass 353, 5 NE2d 545, 547, 108 ALR 1391 (1937); *State ex rel Holloran v. McGrath,* 104 Mont 490, 67 P2d 838, 841-42 (1937); *People v. Richards,* 99 NY 620, 1 NE 258, 260 (1885); *Shelby County v. Memphis Abstract Co.,* 140 Tenn 74, 203 SW 339, 341 (1918); *Tobin v. Knaggs,* 107 SW2d 677, 679-680 (Tex Civ App 1937).

ORS 192.030 authorizes the custodian of records and files "to make reasonable rules and regulations necessary for the protection of the records and files and to prevent the interference with the regular discharge of the duties of such officer." With this protection the agency can prevent unreasonable interference with the conduct of its affairs. In the proper case the fact that the agency is in the process of collecting the data, as was true in the case before us, may in itself be a circumstance justifying the imposition of restrictions upon its use. If the use of the data by persons outside of the agency would unduly disrupt the investigatory process then, certainly, the agency would be justified in postponing the occasion for its use.

■ In determining whether the records should be made available for inspection in any particular instance, the court must balance the interest of the citizen in knowing what the servants of government are doing and the citizen's proprietary interest in public property, against the interest of the public in having the business of government carried on efficiently and without undue interference. The initial decision as to whether inspection will be permitted must, of course,

rest with the custodian of the records. And since the justification for a refusal to permit inspection will depend upon the circumstances of the particular case, we can offer no specific guide for that administrative decision. The difficulty of providing a test is suggested in the following passage from Walter Lippman's "Public Opinion":

"At different times and for different subjects some men impose and other men accept a particular standard of secrecy. The frontier between what is concealed because publication is not, as we say, 'compatible with public interest,' fades gradually into what is concealed because it is believed to be none of the public's business." [As quoted in Cross, The People's Right to Know, p 75.]

In balancing the interests referred to above, the scales must reflect the fundamental right of a citizen to have access to the public records as contrasted with the incidental right of the agency to be free from unreasonable interference. Note: Access to Official Information: A Neglected Constitutional Right, 27 Ind L J 209 (1951). The citizen's predominant interest may be expressed in terms of the burden of proof which is applicable in this class of cases; the burden is cast upon the agency to explain why the records sought should not be furnished. Ultimately, of course, it is for the courts to decide whether the explanation is reasonable and to weigh the benefits accruing to the agency from nondisclosure against the harm which may result to the public if such records are not made available for inspection.

We recognize that ORS 192.010 and 192.030 are susceptible to a construction narrower than that which we have given them. The term "public writing" in ORS 192.010 is defined in ORS 43.010 as follows:

*"43.010 Public writings.* Public writings are

the written acts, or records of the acts, of the sovereign authority, official bodies and tribunals and public officers, legislative, judicial and executive, of this state, the United States, a sister state or a foreign country."

ORS 43.020 then sets forth the types of public writings as follows:

"*43.020  Kinds of public writings.* Public writings are divided into:
  "(1)  Laws.
  "(2)  Judicial records.
  "(3)  Other official documents.
  "(4)  Public records, kept in this state, of private writings."

Although ORS 43.010 is now compiled in the chapter dealing with the admissibility in evidence of public writings, its legislative origin indicates that it was intended to define a public writing not only for the purpose of its admissibility but also for purposes of inspection. However, the subsequent enactment of ORS 192.030, providing that public "records and files" are open to inspection indicates that the legislature intended that the right of inspection should not be limited by the definition of "public writings" in ORS 43.010.

In California, statutes similar to ORS 43.010 and 43.020 have received a rather narrow construction. It has been held that writings are regarded as a "public writing" only if they fulfill two requirements: (1) they must be "official documents" and (2) they must be "the written acts or records of acts" of public officials. *Mushet v. Department of Public Service,* 35 Cal App 630, 170 P 653 (1917). This narrow construction has been criticized. Pickerell, Secrecy and The Access to Administrative Records, 44 Calif L Rev 305 (1956). We believe that the criticism is justified. The terms

"records and files" and "public writings" as used in defining the scope of the right of inspection must be given a liberal construction consistent with the greatest public interest. *In re Mosher,* 248 F2d 956, 959 (Ct of Customs & Patent Appeals 1957); *New York Post Corp. v. Leibowitz,* 2 NY2d 677, 143 NE2d 256, 260 (1957). We are of the opinion that the public interest will best be served by giving the term "records and files" a broad construction embracing all writings in the custody of public officers, rendering such writings subject to inspection unless there are circumstances justifying nondisclosure. As we have already indicated, a more limited construction may be appropriate where the right of inspection is not involved. See e.g., *State v. Brantley,* 201 Or 637, 271 P2d 668 (1954).

In the case at bar the plaintiff's request for data in the possession of the Board was, in practical effect, denied. Dr. Erickson's letter of June 13, 1958 informed plaintiff that "the Board decided that your request could not be granted." The subsequent offer to permit plaintiff to appear before the Radiation Advisory Committee came almost four months after plaintiff's original request for information. No explanation was given to plaintiff as to the reason for referring the matter to the Radiation Advisory Committee. That committee had no power to grant or withhold consent to inspect the Board's records and files. It does not appear that any question of military security or any other need for secrecy was involved in the decision to withhold the information. In fact, the record shows that some of the same kind of data as that sought by plaintiff had been released to the press from time to time.

If the Board was of the opinion that plaintiff's

examination of the data would unreasonably interfere with the Board's activities in carrying out the duties imposed upon it by ORS ch 453, it had the right to place reasonable restrictions upon plaintiff's right of inspection. But the Board took the position that the plaintiff simply had no right to inspect its records and in effect indicated in its correspondence with the plaintiff that any data furnished to him would come to him as a matter of grace and not of right. By this action on the part of the Board and its agents the plaintiff was deprived of his right of inspection under our statutes. Therefore, the decree of the lower court is reversed and the cause is remanded with directions to enter a decree directing the defendants to permit plaintiff to inspect the records in the custody of defendants, subject to such reasonable regulations as the defendants may impose.

Reversed and remanded.

WARNER, J., dissenting.

My reasons for disagreement with the majority are twofold. First, I think that the "records" sought to be examined by plaintiff are not "public writings or records" in the sense employed by ORS 43.020 or as construed by the majority. Secondly, I feel the majority opinion expands definition of "the right to know" beyond what is necessary to arrive at a conclusion in this case. I entertain the belief that "the right to know" and what in fact constitutes a public record should be determined in the light of the circumstances attending the request and the particular legislation which produces the "records" that a given plaintiff desires to inspect.

I subscribe to the statement from *State v. Keller,*

143 Or 589, 601, 21 P2d 807, and quoted in the majority opinion:

"* * *. The public must always have access to all public records required to be kept or made by a public official unless the statute specially provides otherwise."

And I add that the courts should always be vigilant to protect the public's right of access to all public records when in fact a "public record" is the subject of inquiry.

"The right to know" is not, however, an absolute which can compel a discovery of everything done by a given officer or state agency under the color of claim that every writing in the possession of such officer or agency is a "public record" to be exposed on demand of any member of the public no matter how praiseworthy may be the party's motives.

The majority takes cognizance of the existence of such limitations. They note the existence of authority concerning: "information received in confidence" or if "disclosure would be detrimental to the best interests of the state"; and "documentary evidence in the hands of a district attorney." Other limitations on "the right to know" are supplied by many statutes. Two very familiar instances are the prohibitions which prevent disclosure of income tax returns and the minutes of the grand jury (ORS 132.410).

My own position here is aptly expressed by U. S. District Judge Leon R. Yankwich in his statement taken from an article in 48 NW L Rev 527, 530, reading:

"Only documents which present ultimate actions should be accessible to the public. Those which are merely part of the preliminary steps by which the

conclusion was reached should become public *only in the discretion of the particular agency.*"

In the same article Judge Yankwich also observes: "* * * If the record is one that is not kept pursuant to law or as a part of the duty to be discharged by the officer, and is not required to be filed or recorded, it is not subject to public inspection. * * *" (NW L Rev, supra, at 529) Again, at page 530: "* * * in the last analysis, only the memorials representing * * * ultimate action are, in a sense, public. * * *" Those familiar with the record of Judge Yankwich will hesitate to impute to him any inclination to deprive the public of information of public nature which it has a right to know.

In line with the view of Judge Yankwich, the majority observes that "it has been held that writings are not public records if they are 'merely incidental to the administration of the affairs of office.'" This is followed by supporting citations to which I add: *McGarrahan v. New Idria Mining Co.,* 96 US 316, 24 L ed 630; *Lefebvre v. Somersworth Shoe Co.,* 93 NH 354, 41 A2d 924, 926; 45 Am Jur 429, Records and Recording Law § 20; *Cherkis v. Impellitteri,* 307 NY 132, 120 NE2d 530; see, also, 282 App Div 467, 124 NYS2d 816 (another appeal in the same case), where it is said: "There are obvious distinctions between papers for use in an investigation and a culminating official report at the conclusion of the investigation." (124 NYS2d at 817) See, also, 20 Am Jur 866, Evidence § 1027, concerning the admissibility as evidence of reports in contradistinction to records of investigation upon which reports in the nature of public records depend and where it stated:

"According to the theory advanced by some courts, a record of a primary fact made by a public

official in the performance of official duty is, or may be made by legislation, competent prima facie evidence as to the existence of that fact, but records of investigations and inquiries conducted either voluntarily or pursuant to requirement of law by public officers concerning causes and effects, and involving the exercise of judgment and discretion, expressions of opinion, and the making of conclusions, are not admissible in evidence as public records. * * *,"

cited by the court in *Steel v. Johnson,* 9 Wash2d 347, 115 P2d 145, one of the cases referred to in the majority opinion.

It is a familiar canon of construction that statutes are to be interpreted so as to fulfill the policies and attain the results which the legislature had in mind. The Act of 1957 leaves no uncertainty in that respect.

The genesis and purpose of ch 399, Oregon Laws 1957 (ORS 453.610 to 453.650, inclusive), hereinafter called the Act of 1957, illustrates the necessity for a cautious approach in interpretation as to what is in fact a public record and the careful avoidance of possible dangers if the State Board of Health is compelled to prematurely exhibit to plaintiff any part of its data before the formulation of its conclusions in the form of required standards and regulations.

It is impossible to arrive at a sound conclusion in this matter without first taking cognizance of the unusual subject matter of the Act of 1957 and of the importance of the results hoped to be achieved thereby.

The Act is clearly designed with the hope to create by regulations a shield to the lives and happiness of every citizen of the state which will be protective against the potential dangers incident to the use of the most powerful force yet known to man. The legis-

lature is here dealing with one aspect of atomic power and its dangerous impact on all living things.

The seriousness of this situation which confronted the legislature is reflected in Section 1, which reads:

"Whereas radiation can be instrumental in the improvement of health, welfare and productivity of the public if properly utilized, and may impair the health, welfare and productivity of the public and the industrial and agricultural potentials of the state if improperly utilized, it hereby is declared to be the public policy of this state to encourage the constructive uses of radiation and to control any associated harmful effects."

The complexity and extent, chemically and physically, of the problem is demonstrated by the definition of "radiation" found in Section 2(1):

" 'Radiation' means gamma rays, X rays, alpha and beta particles, high speed electrons, neutrons, protons and other nuclear particles; but does not include sound or radio waves, or visible, infrared or ultraviolet light."

Most of the elements referred to have the potentials of great good and great danger to human beings unless properly regulated and controlled.

That it will take time and study of not less than two years before complete or appropriate regulations can be devised is directed by Section 3 which provides:

"The State Board of Health, after making a two-year study of the problem, shall promulgate regulations and standards, in conformance with the policy expressed in section 1 of this Act, for the safe use, handling, disposal and control of all radiation sources within this state * * *."

The legislature realized that an investigation made solely by the State Board of Health could not be suc-

cessful without taking into account "nationally accepted standards." This is disclosed by Sections 4 and 5 of the Act of 1957.

It also recognized that the problem is one of complexity beyond the ken of the Board, acting alone. It, therefore, directed that body to bring to its aid as an advisory committee five persons "who because of their training and experience are qualified to advise" the Board in such matters.

Thus, we find when we read the Act of 1957 in its entirety the legislature was not only conscious of the magnitude of the dangers of nuclear radiation, but properly sensitive to the necessity of long and earnest research and study by the best minds available before a sound set of regulations could be promulgated for public protection.

The Act directs inquiry into a scientific area which is in its infancy, constantly being changed by new discoveries and new evaluations in terms of safety or danger. When we speak of the relative newness of atomic power we need only recall that not more than 15 years ago the world learned in dramatic and catastrophic fashion of the potentialities of nuclear energy, and of the tragic results of the "fallout" when uncontrolled. Day by day since then we are informed of things which are the result of scientific experimentation and experience which tend on one hand to heighten the public apprehension and on the other to still or limit its fears.

It is, however, impossible to conceive that the ultimate success of the legislative mandate can be, if ever, achieved without (1) the counsel of those steeped by experience and scientific training in the physical and chemical attributes of "gamma rays, X rays, alpha and beta particles, high speed electrons, neutrons, protons

and other nuclear particles" (Section 2(1), Act of 1957); and (2) a long season of uninterrupted experimentation and research from day to day both within and without the state before sound averages of experience can be obtained upon which to predicate adequate "regulations and standards" for public protection and "in accordance with nationally accepted standards" (Section 4, Act of 1957).

The limitation imposed by Section 4, supra, reveals that the final conclusions of the Board must necessarily depend upon an active collaboration with national health agencies having the facilities and equipment for greater and more accurate accumulation of information. Recalling as we can do, that most, if not all, of the nuclear "fallout" which gives concern is the product of military tests and experimentation, it is conceivable that no sound regulation or standard can be formulated by a state agency such as the State Board of Health with any indifference to the vast source of material collected by the War Department and then only subject to such limitations in use as a federal agency may properly impose. In the meantime, the data and reports collected from these sources can at best lead only to tentative conclusions before the full period of investigation is terminated.

With these matters in mind, should we give legal character to the demands of the curious who cannot patiently await the final conclusions of the State Board of Health by conferring on each separate seeker, as plaintiff, the right to interrupt and inquire progress of inquiry at any preliminary stage. *Bend Pub. Co. v. Haner,* 118 Or 105, 244 P 868 (1926), was our earliest decision on the subject of right to "inspect" public records. We said at page 110: "To those persons only who have occasion to examine the records for some

lawful purpose, *and not from mere curiosity,* will a writ of *mandamus* be granted: * * *." (Emphasis supplied.)

Plaintiff first demanded to examine the Board's records in April, 1958. At that time the Board had not yet reached the midpoint of its authorized two-year study.

What was plaintiff's purpose? Because, as he testified, he felt that as a scientist he "was in a position to apply this information more intelligently than the general public, and that it was [his] duty to give any information I could to the people to help them so that they would know of the dangers and take whatever steps were appropriate to protect themselves." He approached this self-assumed public responsibility by demanding a right to see everything the Board had.

When asked: "Do you contemplate that you might spread an alarm if you got certain information?", Dr. MacEwan answered, "Yes." When questioned as to what he meant by spreading an alarm, he replied: "What I mean is, if I find there is a large amount of radio-activity in the atmosphere here, in the drinking water, or in the rain water, I would do everything I could to see to it that the people generally were informed of this, so that they might influence their legislators in Washington to put a stop to the bomb tests; that more work would be done in scientific laboratories to attempt to devise means of protecting people from the effects of that radiation, and in these ways to give people the opportunity to know what hazards they were subject to, and be in a position to take steps to do something about it."

Except to influence the cessation of bomb tests, what plaintiff seeks to do by his inquiry midway in the Board's investigation or before the Board reaches

a sound conclusion as to desirable regulations and standards, is precisely what the legislature has impowered the Board to do for all members of the public. Plaintiff, however, would pick and choose as he pleased from the records and broadcast his conclusions as supported by the incomplete data of a state agency.

What is plaintiff's proposed method of disseminating the information obtained from his examination of the Board's accumulated data? "I would speak to the people that I knew; I would address groups; I would inform the newspapers; I would write letters to the newspapers; I would write to my congressmen; things of this sort."

Plaintiff arrogates to himself a tremendous responsibility when he suggests that he, alone, by examining such data as the Board had at the time of his request could evaluate it and, as he proposes in justification, then advise the public what would be best calculated to guard against or minimize the effects of such radiation. Before the Board had yet completed its statutory task, plaintiff has the astounding temerity to proclaim that he can better do, in shorter time, and will do for the public that which the law says the Board of Health can and should do after two years of investigation. In short, he proposes for himself the role of a scientific Paul Revere, but with this difference: Revere made certain the British were coming before giving the alarm.

It is a matter of common knowledge that "radiation," as described in the Act, may at times be found in many forms and substances—air, water, milk, rain, snow, animal tissues and products for food consumption. We also know that the degree of content is variable. Being so, research results may reflect a higher degree of radiation at one day or season of the year

than another and more particularly after a given military test of nuclear power. To permit any person to examine and report on data which may reflect an extraordinarily high degree for a limited period or an extraordinarily low potential of radiation, might well breed an overanxiety complex in the public or induce a conclusion of unwarranted confidence in its safety. For such an inquisitor to go forth, as plaintiff proposes, and broadcast his conclusions predicated upon the incomplete findings of the Board as authoritative advice to the public could easily result in infinite harm.

If any legislative act demonstrates the cogency of Judge Yankwich's observations and the soundness of the above citations which follow that statement, certainly it is the Act of 1957. The majority torture the meaning of words when they accord to the data resulting from the Board's preliminary investigations the legal status of "public records" or "public writings."

The right to know is not the prerogative of an interloper or intermeddler who assumes to himself the office of a public counselor and to use for his purposes incomplete data gathered by others to whom has been assigned by statute the duty to give such advice.

In denying plaintiff the right to inspect all records of the Board on the subject of radiation before its task is finished, we do not take from him his right to know, but merely suspend or defer the privilege of inquiry until the Board reaches a point of final conclusion and reflects its judgment in its determination of what are proper regulations and standards for the public use and protection. When the Board thus completes the work imposed by the Act of 1957, then plaintiff and all others properly interested should have the privilege of examining the final report and all data marshaled by the Board in support of its conclusions.

I, therefore, think the judgment should be affirmed. Justices PERRY and SLOAN concur in this dissent.

PERRY, J., dissenting.

I must dissent from the opinion of the majority.

It seems quite clear to me that the plaintiff is not the proper party to maintain this suit in that he has not sufficient interest therein. If the plaintiff's complaint is construed as seeking a mandatory injunction (and I am unable to construe the complaint in any other manner) to compel the defendant officers, who constitute the State Board of Health, to make available for inspection certain data which they have gathered relating to atomic radiation fallout, then the plaintiff stands in the same position as every other member of the public.

It is hornbook law that if a mere public right is to be vindicated, in the absence of statute, the action must be brought by a public officer charged with the duty of enforcing the law. *Fields v. Wilson,* 186 Or 491, 207 P2d 153; *Winslow v. Fleischner et al.,* 110 Or 554, 223 P 922; *Friendly v. Olcott,* 61 Or 580, 123 P 53; *State ex rel v. Dunbar,* 48 Or 109, 85 P 337; *State ex rel v. Lord,* 28 Or 498, 43 P 471; *Sherman v. Bellows,* 24 Or 553, 34 P 549; 28 Am Jur 680, Injunctions § 178.

The plaintiff herein shows no right different from the public which would grant this court or any court jurisdiction to determine the issue presented on its merits.

I am also convinced that the plaintiff has mistaken his remedy and that a court of equity had no jurisdiction to proceed therein.

The purported complaint seeks to compel the officers of the State Board of Health to do an act alleged to be enjoined upon them by law. I have been unable to find any cases where a court of equity has

ever granted the extreme remedy of a mandatory injunction to compel the doing by a state officer of a ministerial act.

ORS 34.110 provides:

"A writ of mandamus may be issued to any inferior court, corporation, board, officer or person, to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust or station; but though the writ may require such court, corporation, board, officer or person to exercise its or his judgment, or proceed to the discharge of any of its or his functions, it shall not control judicial discretion. The writ shall not be issued in any case where there is a plain, speedy and adequate remedy in the ordinary course of the law."

Mandamus is an action at law. *City of Cascade Locks v. Carlson,* 161 Or 557, 90 P2d 787; *Beard v. Beard,* 66 Or 512, 133 P 797, 134 P 1196.

Therefore, since the plaintiff has an adequate remedy at law provided by legislative enactment, a suit for mandamus may not be maintained in a court of equity. This is the rule, according to the clear weight of authority, where a person seeks relief of a mandatory nature. 28 Am Jur 537, Injunctions § 42; 93 ALR 1495. See also *Kane v. Walsh,* 295 NY 198, 66 NE2d 53, 163 ALR 1351.

If the matter is to be considered upon its merits, then I would sustain the trial court upon two grounds.

First, I do not believe that data being collected by an authorized body for the purpose of formulating rules and regulations are, at least until the duties of the body have been performed, public writings under ORS 192.010, or records and files under ORS 192.030.

It seems clear to me that both of these sections refer to records which are either required to be kept

by law or records which the law may be said to require to be kept to fully disclose the necessary operations of a state or municipal office.

"The people's right to know" must be limited to their right to investigate the conduct of their affairs. It cannot be deemed to go to the right to pry into the substance of the data being acquired to carry out a duty which the people have delegated to their officers.

Secondly, I would sustain the action of the trial court upon grounds developed in the majority opinion: "There may be circumstances under which the information contained in a record may be justifiably withheld from the person seeking it."

The plaintiff in this case states his reason as follows:

"A Well, the purpose is really multiple. As one trained in plant physiology, which is very closely allied to other physiology, and as one who is studying genetics, I am particularly aware of the fact that any and all radiation is harmful to all human beings.

"It is not just my conclusion, but a conclusion that has been voiced by a committee of geneticists acting for the National Science Foundation, who wrote a report which was submitted to the President and which has been published.

"Because of the hazards of radiation, and because of the published statements that atom bomb tests were being conducted, and the knowledge that these atom bomb tests produce radioactivity material, I was anxious to find out how much of that radioactive material was falling here in Portland, what it was doing to our health, to our rain water, and foods, and drinking water. In other words, I wanted to know anything I could find out about how much additional radiation I, and my family, and the people of Portland, were subjected to as a consequence of the atom bomb tests then going on and the ones that had gone on in the past.

"The reasons I wanted this information were several. I wanted it simply for my general knowledge because I am interested in scientific matters, and this would come within that field. Because of its potential danger to my family, and to myself, I wanted to know its magnitude in order that I might determine what, if anything, could be done, and what the urgency was in doing it.

"Furthermore, I felt that in my position as a scientist my position was somewhat unique, not as compared with other scientists but with the general public, in that I was in a position to apply this information more intelligently than the general public, and that *it was my duty to give any information I could to the people to help them so that they would know of the dangers and take whatever steps were appropriate to protect themselves.*" (Italics supplied.)

From the foregoing, it must be noticed that the trial court had before it a man who admitted he was not qualified to properly analyze the effect of the radioactive fallout data gathered, either upon plants or people, but who believed that any and all radiation is harmful to all human beings. This is of course contrary to all of the bulletins issued by the Federal Government and the act under which the Board of Health was authorized to act. ORS 453.620.

The plaintiff was also, with his lack of knowledge, planning to set himself up as a public informant and adviser. With his admitted lack of knowledge, this could only lead to public misinformation and perhaps to public panic.

Under these circumstances, in my opinion, the public interest outweighed the rights of the individual and the trial court quite properly dismissed the plaintiff's case.

I would affirm the judgment of the trial court.