486 P.2d 608

Ernest T. SANCHEZ and Arthur M. Dula III, Petitioners-Appellees,

v.

BOARD OF REGENTS OF EASTERN NEW MEXICO UNIVERSITY et al., Respondents-Appellants.

No. 9105.

Supreme Court of New Mexico.

May 28, 1971.

Rehearing Denied June 29, 1971.

Motion for Leave to File Second Rehearing Denied July 20, 1971.

James A. Maloney, Atty. Gen., Santa Fe, Fred Boone, Sp. Asst. Atty. Gen., Portales, for respondents-appellants.

Paul A. Phillips, Albuquerque, for petitioners-appellees.

Hal Simmons, Albuquerque, amici curiae on behalf of New Mexico Press Assn. and New Mexico Broadcasters Assn.

## OPINION

McMANUS, Justice.

This is an appeal from the granting by the District Court of Roosevelt County of a writ of mandamus.

Both petitioners-appellees (Petitioners) were students at Eastern New Mexico University (ENMU). Mr. Sanchez was editor of and reporter for the ENMU Chase, the student newspaper. Mr. Dula was a photographer for it. Respondents-appellants (Respondents) are the Board of Regents of ENMU and the individual members of the board. Mr. Wheeler, one of the Respondents, is chairman of that board. Dr. Charles W. Meister, not a party, is President of ENMU.

Petitioners sought to inspect a certain list of proposed faculty salaries. The requests were refused by Respondents and this action followed. The writ of mandamus from the granting of which this appeal was taken directed Respondents to produce a "list of faculty contracts and salary provisions." We take note of the amicus curiae brief filed on behalf of the New Mexico Press Association and the New Mexico Broadcasters Association.

On March 13, 1970, Respondents held a meeting in Roswell with Petitioners in attendance. The conduct of the meeting generally did not win the approval of Petitioners, but their specific complaint has to do with certain proceedings had by the board in relation to faculty salaries for the upcoming school term. Section 73–22–7, N.M.S.A.1953 (made applicable to the ENMU Regents by § 73–22–36, N.M.S.A. 1953) charged the board to " * * * determine the compensation to be paid to the superintendent and teachers."

After administrative activity by the staff which is not pertinent, Dr. Meister was prepared to present his recommendations to the board. To facilitate this evolution, a list of proposed faculty salaries for the 1970–71 term was prepared and presented to the board at the March 13 meeting. The list was broken down into various colleges and departments. The faculty members' names were listed at the appropriate place with his or her proposed annual salary set opposite.

The list was not a document required by law to be prepared or preserved. It was prepared and used as a matter of administrative convenience, but preparation and use of some sort of list was a practical necessity, because it classified and named in excess of 160 individuals and set forth a proposed salary for each. The salaries listed aggregated about $1,500,000.

The board, by motion made, seconded and carried, approved the list. The offers were made by inserting the faculty member's name and proposed salary into a form of offer covering the 1970–71 school year,

affixing Dr. Meister's signature thereon, and transmitting the document to the faculty member. This transmittal also occurred on March 13.

These procedures resulted in no contract to which ENMU or the State was a party. A contract could only come into being upon acceptance of the offer by the individual faculty member. The offer might be accepted by the faculty member, or the offer might be refused, or a counter-offer transmitted. Negotiations might be had between the staff and the faculty member which might or might not result in a contract. All of these things normally occur between the time of the making of the offers and the June 30 deadline.

Proceedings at the March 13 meeting of the board would, in the normal course, be embodied in minutes and approved at the next board meeting. The minutes are not before us. The manner in which the material action of the board is treated in the minutes plays no part in our decision.

It is clear that Petitioners requested inspection of the list at the March 13 meeting, which was prior to the making of the offers, and made further requests on March 16 and 17, subsequent to the transmission of the offers but prior to the June 30 deadline when the offers might be in the process of acceptance, rejection or negotiation.

Section 71–6–2(C), N.M.S.A.1953 (Supp. 1969) reads as follows:

" 'Public records' means all books, papers, maps, photographs or other documentary materials, regardless of physical form or characteristics, made or received by any agency in pursuance of law or in connection with the transaction of public business and preserved, or appropriate for preservation, by the agency or its legitimate successor as evidence of the organization, functions, policies, decisions, procedures, operations or other activities of the government, or because of the informational and historical value of data contained therein. Library or museum material of the state library, state institu-

tions and state museums, extra copies of documents preserved only for convenience of reference, and stocks of publications and processed documents are not included;"

Petitioners assert that the list was a public record which they were entitled to inspect by the provisions of §§ 71–5–1 and 71–5–2, N.M.S.A.1953. Section 71–5–1, supra, provides:

"Every citizen of this state has a right to inspect any public records of this state except records pertaining to physical or mental examinations and medical treatment of persons confined to any institutions and except as otherwise provided by law."

Section 71–5–2, supra, provides:

"All officers having the custody of any state, county, school, city or town records in this state shall furnish proper and reasonable opportunities for the inspection and examination of all the records requested of their respective offices and reasonable facilities for making memoranda abstracts therefrom, during the usual business hours, to all persons having occasion to make examination of them for any lawful purpose."

The writ of mandamus granted by the trial court and ordered to be made permanent by a later "Decision" of the court, read in part as follows:

"Whereas, it has been made to appear by the verified complaint of Ernest T. Sanchez and Arthur M. Dula III that you, the respondents, have refused to allow the petitioners to inspect public records in your possession, namely, the list of faculty contracts and salary provisions, * * *."

The writ referred to "faculty contracts and salary provisions" and not to proposed contracts and salary provisions which were still in a negotiation stage. Obviously, completed contracts would be public records and available to inspection under the provisions of the New Mexico statutes.

MacEwan v. Holm, 226 Or. 27, 359 P.2d 413 (1961) contains a scholarly review of

the entire field of the public's right of inspection of records. In MacEwan, supra, the defendant sought to inspect data relating to nuclear radiation sources collected by the Oregon State Board of Health. The Oregon Supreme Court held that the data involved were "public records" for purposes of inspection by the public. This case can be readily distinguished from the instant case inasmuch as scientific data obtained is the result of testing of at least one facet of the over-all purpose of the research. In MacEwan v. Holm, supra, this phase of the research had been completed, whereas in our case we only have an offered contract with no finality attached to it. In the MacEwan case, supra, the court said:

"Whether a record is to be regarded as a public record in a particular instance will depend upon the purposes of the law which will be served by so classifying it. And a record may be a public record for one purpose and not for another."

We believe that no useful purpose would be served by disclosing preliminary contractual negotiations between the board and its professional and other employees.

We do not consider "thought processes," that is, the offer of a contract, such a public record as would require public inspection. See Kottschade v. Lundberg, 280 Minn. 501, 160 N.W.2d 135 (1968), and Sorley v. Clerk, Mayor and Board of Trustees, 30 A.D.2d 822, 292 N.Y.S.2d 575 (1968).

United States District Judge Leon R. Yankwich of the Southern District of California, had this to say in an article published in 48 N.W.L.Rev. 527, 530 (1953–54):

"Only documents which present ultimate actions should be accessible to the public. Those which are merely part of the preliminary steps by which the con-

clusion was reached should become public, *only in the discretion of the particular agency * * *.*

"If the record is one that is not kept pursuant to law or as a part of the duty to be discharged by the officer, and is not required to be filed or recorded, it is not subject to public inspection. * * * *[I]n the last analysis, only the memorials representing * * * ultimate action are, in a sense, public. * * *"* (Emphasis added.)

In Linder v. Eckard, 152 N.W.2d 833 (Iowa, 1967), property owners requested certified copies of written appraisal reports from the city clerk and director of urban renewal. The request was refused. The Iowa Supreme Court held that:

"Under the particular circumstances existing here, we find that the appraisals in question are not public records or writings and that appellants are not entitled to certified copies of them * * *."

See, also, Wiley v. Woods, 393 Pa. 341, 141 A.2d 844 (1958), and Coldwell v. Board of Public Works, 187 Cal. 510, 202 P. 879 (1921).

Giving the full context to the question, we must determine whether we should give legal character to the demands of the curious who cannot patiently await the final result of a salary contract negotiation. We would deny the right to inspect these records of the Board of Regents on the subject of salary contract negotiations before the task was completed. It would not seem fair that the general public should know the contents of an offer of salary to an individual conceivably prior to the receipt of the offer by the contemplated employee. As indicated in the MacEwan case, supra, we would not take away the right of the Petitioners to know about salary matters, but would merely suspend or defer the privilege of inquiry until the Board of Regents reaches its final conclu-

sion, i. e., the culmination of the contract between the board and the individual.

This cause is hereby reversed.

It is so ordered.

COMPTON, C. J., and TACKETT, J., concur.

OMAN and STEPHENSON, Justices (dissenting).

We feel obliged to dissent from the majority opinion. In our view, the beneficent purposes of §§ 71–5–1 and 71–5–2, N.M.S.A., 1953 would be fostered and the intention of the legislature better served by adopting a broader interpretation of the statutes, enhancing rather than restricting availability of governmental information and news sources.

Although the cited statutes were passed in 1947 and have been the subject of numerous opinions of the attorney general, no opinion of this court or of the Court of Appeals has had occasion to construe them. In fact, so far as we can discover, § 71–5–1 has only been twice cited, first by the Court of Appeals in State v. Harrison, 81 N.M. 623, 471 P.2d 193 (Ct.App.1970) in which the court, for purposes of resolving a legal point, assumed it to be applicable, and in Ortiz v. Jaramillo, our number 9149, opinion filed April 5, 1971 (82 N.M. 445, 483 P.2d 500) in which the parties conceded the records in question were public records.

The majority opinion quotes from the writ to the effect that it referred to "faculty contracts and salary provisions" rather than those which were proposed, and that completed contracts would obviously be available for inspection.

No contention has been advanced here or below that there is any doubt, confusion or controversy about which document or "list" is the subject of the writ and of this appeal. This is seemingly made clear in the splendid statement of facts which graces the forepart of the majority opinion.

The wording of the writ seems to play no role in the disposition of the case, since the majority proceeds to deal with the merits.

Implicit in our form of government is the necessity for a free flow of information to the citizenry. This tenet has achieved status as a basic doctrine of political science. For example:

"The basis of our governments being the opinion of the people, the very first object should be to keep that right. The right to prevent [errors of] the people, is to give them full information of their affairs through the channel of the public papers, and to contrive that these papers should penetrate the whole mass of the people." [Thomas Jefferson quoted] Laswell, National Security & Individual Freedom 62 (1950), 27 Ind.L.J. 212, n. 11 (1952).

"Knowledge will forever govern ignorance. And a people who mean to be their own governors, must arm themselves with the power knowledge gives. A popular government without popular information or the means of acquiring it, is but a prologue to a farce or a tragedy, or perhaps both." [James Madison] Laswell, supra, 62, 27 Ind.L.J., supra, 211, n. 9.

"I, for one, have the conviction that government ought to be all outside and no inside. I, for my part, believe that there ought to be no place where anything can be done that everybody does not know about * * *. Everybody knows that corruption thrives in secret places, and avoids public places, and we believe it a fair presumption that secrecy means impropriety * * *. Government must, if it is to be pure and correct in its process, be absolutely public in everything that affects it." Woodrow Wilson, The New Freedom, 92–104 (1913), 11 Kan.L. Rev. 157 (1962).

Although there is authority to the effect that no right to inspect public documents or records existed at early English common law, the doctrine was later formulated that persons were entitled to inspection provided they had an interest that would

enable them to maintain or defend an action for which the document or record could furnish evidence or necessary information. 45 Am.Jur. "Records and Recording Laws" § 17. In Nowack v. Fuller, 243 Mich. 200, 219 N.W. 749 (1928), Annot., 60 A.L.R. 1351 (1929) the court rejected the early English common law doctrine and said that there was no " * * * question as to the common law right of the people at large to inspect public documents and records." Although the common law right was subject to various limitations, it seems clear that some right existed to inspect public documents. Accordingly, it is our view that the statutes here involved, rather than being in derogation of the common law, enlarge a common law right and should therefore " * * * be liberally construed in favor of inspection." 76 C.J. S. Records § 35 b (1952).

The issues of this lawsuit are whether the list in question was a public record and, if so, whether the circumstances here nevertheless fall within some recognized exception to the general rule of availability for inspection. Deciding these matters involves a decision as to which party carries the burden of proof.

In few if any states has the legislature attempted to define public documents for purposes of their inspection statutes or to spell out the circumstances under which inspection may be required. Rather, such matters have been left to the courts. Study of many cases, texts and law reviews convinces us that the leading case on the subject is MacEwan v. Holm, 226 Or. 27, 359 P.2d 413 (1961), Annot., 85 A.L.R.2d 1086 (1962). The majority opinion in that case adopts a broad approach to the public's right of inspection of records and is a scholarly review of the entire field. The dissent espouses a more restrictive viewpoint.

MacEwan points out divergent results reached in many cases upon the subject of what constitutes a public record, and one explanation for this is the failure to key the definition of "public record" to the purpose of the law which will be served by so classifying it. For example, the majority opinion cites and quotes § 71-6-2(C), N.M.S.A., 1953 (1969 Supp.). That section unquestionably defines the term "public record" but it does so for purposes of the Public Records Act (§§ 71-6-1 to 71-6-17) which deals with the subject of preservation and storage of public documents rather than the right of citizens to their inspection. It seems clear to us that that statute has no bearing upon the issues here.

We are frankly uncertain as to whether the majority opinion reaches its result on the basis that the document in question is not a public record or whether, although considering it to be a public record, it is nevertheless felt that under the facts of this case inspection ought to be denied. We would hold that the list is a public record and that it does not fall within any exception.

Respondents have here asserted that the list in question was not a public record within the meaning of § 71-5-1, supra. We are of the view that the court should adopt a liberal construction of our statute upon the issue of what constitutes a public record. The majority in MacEwan states:
"Writings coming into the hands of public officers in connection with their official functions should generally be accessible to members of the public so that there will be an opportunity to determine whether those who have been entrusted with the affairs of government are honestly, faithfully and competently performing their function as public servants. [Citations omitted] 'Public business is the public's business. The people have the right to know. Freedom of information [about public records and proceedings] is their just heritage. * * * Citizens * * * must have the *legal* right to * * * investigate the conduct of [their] affairs.' [Citation omitted]"

Measured by these criteria, it is apparent that the construction apparently placed on

§ 71–5–1, supra, by the majority is too narrow. The list was a writing, representing the, final recommendations of the ENMU staff, coming into the hands of Respondents as public officers in connection with their official duties. Certainly, any lingering doubt as to the list being a public record is removed by the imprimature of official action placed on the list by Respondents by their approval of it.

Respondents next assert that, without a lawful purpose, no citizen has the right to examine public records. This statement is obviously correct because of the provisions of § 71–5–2, supra. But the answer to Respondents' contention is that they had the burden of proving that the purpose of the Petitioners was unlawful, which they failed to do. As to the burden of proof, we refer again to MacEwan:

"In balancing the interests referred to above, the scales must reflect the fundamental right of a citizen to have access to the public records as contrasted with the incidental right of the agency to be free from unreasonable interference. [Citation omitted] The citizen's predominant interest may be expressed in terms of the burden of proof which is applicable in this class of cases; the burden is cast upon the agency to explain why the records sought should not be furnished. Ultimately, of course, it is for the courts to decide whether the explanation is reasonable and to weigh the benefits accruing to the agency from nondisclosure against the harm which may result to the public if such records are not made available for inspection."

The Respondents do not allege Petitioners' purpose to have been unlawful, nor was the court requested to so find, although Respondents did request a finding to the effect that Petitioners had failed to prove that their purpose was lawful, indicating an erroneous theory as to the whereabouts of the burden of proof. In any case, the court made no finding on this issue, and the findings which it did make are supported by substantial evidence.

A more difficult and troublesome issue is presented by Respondents' claims, in substance and effect, that disclosure of the list would be detrimental to the best interests of the state and would unreasonably interfere with the business of government. They point out that it was the custom to treat salary offers as confidential; that various faculty members considered it an invasion of privacy to disclose negotiations; that it would be injurious to the morale of the faculty and that the negotiations concerning the employment contracts would be upset and disturbed. These arguments are serious and persuasive.

As stated in MacEwan, there are qualifications to the public's right of inspection, and circumstances may arise in which inspection can be justifiably withheld. For example, inspection may be withheld if the information is sought for an unlawful purpose, as is specifically provided in our statute. Even when the purpose is lawful, if the information has been received in confidence or if it is confidential and privileged, or if the disclosure would be detrimental to the best interests of the state, the right of inspection may properly be refused. The right of inspection cannot be exercised so as to unreasonably interfere with the business of government, such as unduly disrupting an investigatory process.

Referring once more to the majority opinion in MacEwan, it is said on this subject:

"In determining whether the records should be made available for inspection in any particular instance, the court must balance the interest of the citizen in knowing what the servants of government are doing and the citizen's proprietary interest in public property, against the interest of the public in having the business of government carried on efficiently and without undue interference. The initial decision as to whether inspection will be permitted must, of course, rest with the custodian of the records. And since the justification for a refusal to permit inspection will depend upon the

circumstances of the particular case, we can offer no specific guide for that administrative decision."

In the case at bar, it is easy to visualize resulting mischief from disclosure and dissemination of the list to no useful purpose other than to occupy the columns of the school newspaper and to create another tempest in another teapot, an evolution considered a useful purpose in itself in certain quarters. It was not, however, incumbent upon Petitioners to demonstrate that any benefit from their actions would accrue to the school, the public or the state.

It is here, if we understand the majority opinion aright, that we basically take our departure from it. The majority holds that no "useful purpose" would be served by disclosing preliminary negotiations; that only ultimate actions should be accessible or that unreasonable interference with the business of government might result. Although we are firm in our view that it was not the burden of Petitioners to demonstrate a "useful purpose," we would concede the other grounds to be debatable. However, in our opinion, the fundamental and overriding principle to be served is preserving and protecting free access by citizens, including representatives of the media, to information regarding the conduct of governmental affairs, however saddening may be the results which ofttimes occur in individual cases.

Accordingly, when we weigh and " * * * balance the interest of the citizen in knowing what the servants of government are doing * * * against the interest of the public in having the business of government carried on efficiently and without undue interference," we cannot in good conscience say that the latter outweighs the former; that Respondents have proven that such would be the case nor that the trial court's findings of fact in favor of disclosure are not supported by substantial evidence.

The majority's position seems to be grounded to a considerable extent on the oft cited and quoted statement of Judge Yankwich from Northwestern University Law Review to the effect that it is only documents which represent ultimate action which should be available to the public for inspection as a matter of right and that inspection of preliminary steps should be in the discretion of the agency. Admittedly numerous cases so hold. We have taken the position that such a narrow interpretation of our statutes imposes an unconscionable restriction, but apart from questions of policy, we are by no means convinced that the document of which inspection was here sought was preliminary.

The matter presented to Respondents for their consideration was what *offers* should be made to the faculty. The list in question constituted Dr. Meister's recommendations. The action of the Respondents in approving the list represented final action on that subject, and the offers were thereupon made and transmitted.

It seems to us to furnish no answer to say that the final contracts would be available for inspection. Any particular contract actually made may or may not embody the Respondents' first offer, and in fact offers may have been made which did not result in contracts. The first offer is one subject and the final contracts another.

On the stated grounds, we respectfully dissent.