KUTV, INC., a Nevada corporation, and Karl Idsvoog, Plaintiffs and Appellants,

v.

UTAH STATE BOARD OF EDUCATION, an agency of the State of Utah; Dr. Walter Talbot, Utah State Superintendent of Public Instruction; Board of Education of the Box Elder School District, a body corporate of the State of Utah; Morgan Hawkes, Superintendent of the Box Elder School District, Defendants and Respondents.

No. 18799.

Supreme Court of Utah.

Oct. 12, 1984.

Alan L. Sullivan, Patrick A. Shea, Kate Lahey, Salt Lake City, for plaintiffs and appellants.

David L. Wilkinson, Atty. Gen., William T. Evans, Mark C. Moench, John McAllister, Salt Lake City, Walter G. Mann, Box Elder & Hawkes, Brigham City, for defendants and respondents.

HALL, Chief Justice:

In response to allegations of religious and racial discrimination in the Box Elder School District, employees of the Utah State Board of Education, after consultation with the superintendent of the Board of Education of the Box Elder School District, developed and prepared a survey form designed to elicit responses concerning discrimination at Box Elder High School.

The survey form contained eleven questions, eight of which had fixed-choice responses and three of which required written responses. The first four questions elicited information from the respondent as to his or her grade in school or educator status, sex, religion and the number of years the person's family had lived in the Box Elder area. Questions five through seven required the respondent to answer "Often," "Sometimes," "Rarely," or "Never," to questions asking whether respondent felt that "students of different racial backgrounds," non-LDS students or "newcomers" experienced discrimination at Box Elder High School. Question eight asked whether the respondent felt that some students received preferential treatment at the high school and, if "yes," what kind of students. In question nine the respondent was asked to indicate whether he or she had personally witnessed an instance of religious or racial discrimination. Question ten asked respondent to describe any instance of discrimination personally observed, but cautioned the respondent not to name names. Finally, question eleven asked respondent to give his or her opinion as to what could be done at the high school to "promote fair, impartial treatment of all students."

At the top of each survey form, the following instructions were printed:

We ask for your honest and straight foward [sic] response. The questionanires [sic] are completely anonymous, so do *not* write your name or other information which would identify you. The information we receive from the questionnaire will be handled confidentially. While we would encourage you to answer the questions fully, if for some reason you have concern about one or more questions, you have the right not to answer those questions.

The survey forms were distributed to Box Elder High School students and their teachers in May, 1981. While not all students completed the forms, 963 completed forms were returned to the State Board of Education. Employees of the State Board of Education analyzed the data resulting from the survey and released a statistical analysis of the responses to the eight fixed-choice questions to the public.

The summary disclosed that many of the students thought that both racial and religious discrimination existed at Box Elder High School. For example, 53% of the respondents answered that students of different racial backgrounds experienced discrimination often or sometimes and 75% of non-LDS students responded that non-LDS students experienced discrimination sometimes or often.

KUTV, Inc. and Carl Idsvoog, a reporter, asked the Board of Education to either allow them to inspect the actual completed questionnaires or edited questionnaires from which any names or information that could uniquely identify an individual had been deleted. Both requests were refused. Appellants thereupon filed an action in district court to obtain access to edited or unedited survey responses. The district court, in its summary judgment against appellants, held that the survey responses were not public records within the meaning of either the Archives and Records Service and Information Practices Act, U.C.A., 1953, § 63–2–59, *et seq.*, or the Public and Private Writings Act, U.C.A., 1953, § 78–26–1, *et seq.*, and were not required to be disclosed to the public. KUTV appeals that decision.

█ The Archives and Records Service and Information Practices Act has as its intent, among other things: "[T]o establish fair information practices to ensure that the rights of persons are protected and that proper remedies are established to prevent abuse of personal information."[1] To fulfill this intent, the Legislature provided for the creation of an administrative body, the State Records Committee,[2] which has specific duties with regard to "data on individuals"[3] collected and maintained by state government. If an item is determined to be "data on individuals," it comes under the jurisdiction of the State Records Committee, which must then categorize the data as public data,[4] confidential data[5] or private data.[6] KUTV contends that the completed surveys constitute "data on individuals" and should be classified as public data. The Board argues that the survey forms themselves should not be released because they contain information on individuals that may be damaging to those individuals. The Board, however, contends that this information on individuals does not constitute "data on individuals" as defined by section 63–2–61(9):

"Data on individuals" includes all records, files and processes which contain any data on any individual and which are kept or intended to be kept by state government on a permanent or semi-permanent basis, including, but not limited to, that data by which it is possible to identify with reasonable certainty the person to whom such information pertains.

It clearly appears from the language of the definition, combined with the intent of the Archives Act, that the Act was not intended to cover information such as that contained in the responses to the survey. While it is arguable that the survey forms contain "data on any individual ... by which it is possible to identify with reasonable certainty the person to whom such information pertains," the completed surveys do not constitute data kept by government on individuals primarily because the surveys were not intended to be kept by state government on "a permanent or semi-permanent basis." Affidavits in the record maintain that, according to established

1. U.C.A., 1953, § 63–2–60.

2. U.C.A., 1953, § 63–2–68.

3. As defined by U.C.A., 1953, § 63–2–61(9).

4. As defined by U.C.A., 1953, § 63–2–61(12).

5. As defined by U.C.A., 1953, § 63–2–61(13).

6. As defined by U.C.A., 1953, § 63–2–61(14).

practice, the forms were to be destroyed after the information contained in them had been summarized and evaluated. Thus, the forms would be kept only as long as it took to assimilate the data. By no stretch of the imagination could this period of time be construed to be keeping data on a permanent or even a semi-permanent basis.

This Court has had the opportunity to interpret the Archives Act only once, in *Redding v. Brady*.[7] In that case, the State Records Committee had classified salaries paid employees of state agencies and institutions as "public data" and thus available for public inspection. A student newspaper editor, John Redding, had requested the names of Weber State College employees and the gross salaries paid them. The college administration refused, and Redding filed an action to compel the college to release the information. The district court granted the motion, which this Court upheld. The information requested in that case, names and gross salaries of college employees, clearly is the kind of information the Legislature intended the Act to cover. Other examples might be medical records or school records.

KUTV next contends that if the Archives Act does not apply to the survey forms, then the forms are public records under the Public and Private Writings Act and must be made available to the public for inspection. Section 78-26-2 of the Public and Private Writings Act says: "Every citizen has a right to inspect and take a copy of any public writing of this state except as otherwise expressly provided by statute."

Public writings fall into four categories:

(1) Laws.

(2) Judicial records.

(3) Other official documents.

(4) *Public records*, kept in this state, of private writings, which such records may be made by handwriting, typewriting, or as a photostatic microphotographic, pho-

tographic, or similar reproduction of such private writings.[8]

No definition of public records is given in the Public and Private Writings Act. However, this Court in *Brady* specifically used the definition of public records given in the Archives Act to define public records for the purposes of interpreting the Public and Private Writings Act. Section 63-2-61(1) defines public records as:

[A]ll written or printed books, papers, letters, documents, maps, plans, photographs, sound recordings, and other records made or received in pursuance of state law or in connection with the transaction of public business by the public offices, agencies, and institutions of the state and its counties, municipalities, and other subdivisions of government.

There is little doubt that these completed survey forms fall within this definition since the forms are written (completed forms) and printed papers (uncompleted forms) made (by employees of the Utah State Board of Education) and received (also by the same employees) in connection with the transaction of public business (monitoring performance of school districts and improving that performance) by an agency of the State (Board of Education) and a subdivision of government (Box Elder Board of Education).

As indicated by section 78-26-2, a citizen of Utah has the right to inspect and take a copy of any public writing "except as otherwise expressly provided for by statute." The Legislature therefore can, and has, provided for statutory exemptions.[9]

However, the completed questionnaires do not fall into any of the categories the Legislature has seen fit to specifically exempt. Thus, the inquiry does not end there.

The obvious intent of the Legislature in enacting both the Archives Act and the Public and Private Writings Act was to

---

7. Utah, 606 P.2d 1193 (1980). The Archives and Records Services Act interpreted there has since been amended and is now the Archives and Records Service and Information Practices Act. However, the sections pertinent herein remain virtually intact from the *Brady* statute.

8. U.C.A., 1953, § 78-26-1.

9. *See, e.g.,* U.C.A., 1953, § 53-48a-1, *et seq.*

provide public access to actions of state government. The presumption in cases such as this has always been public access, subject only to specific statutory restrictions, personal privacy rights, and countervailing public policy.

■ The Court recognizes that it is the policy of this state that public records be kept open for public inspection in order to prevent secrecy in public affairs.[10] However, we subscribe to the reasoning of the California Supreme Court in *Bruce v. Gregory*,[11] where that Court, interpreting a statute virtually identical to Utah's Public and Private Writings Act,[12] said that "rights created by [the Right to Know Act] are, by their very nature, not absolute, but are subject to an implied rule of reason."[13]

Thus, the questionnaires are subject to inspection by an interested citizen unless they are confidential or of such a nature that it would be in the public interest to prevent disclosure.[14]

■ The Board contends that the promise of confidentiality made at the top of each form is sufficient to preclude disclosure of the forms. The promise only, however, is not sufficient.[15] If this Court allowed a promise of confidentiality to end the inquiry, any state official could eliminate the public's rights under the Public and Private Writings Act. This is not an acceptable result. Breach of a promise of confidentiality standing alone is not of sufficient harm to the public's interest to prevent disclosure. In this situation, as in others, promises of confidentiality cannot always be kept.[16] The promise would have to coincide with reasonable justification based on public policy for refusing to release the records.[17]

■ The Board has advanced no public policy reason why the factual data contained in the responses to the eight fixed choice questions should remain confidential and has, in fact, released summaries of those responses. The Board does, however, argue that disclosure of the subjective responses to the three remaining questions would not be in the public interest because the subsequent identification of individuals would be embarrassing and possibly detrimental to those individuals and to individuals misidentified and would have a chilling effect on the candor expressed in future responses to similar questionnaires. However, the Board's mere unsubstantiated assertion that disclosure of the questionnaire contents would be embarrassing and possibly detrimental to certain individuals is insufficient to support a judicial ruling that disclosure would be contrary to the public interest.

■ The Board also contends that the custodian can unilaterally declare a public record to be confidential. This position misstates the actual duty. A custodian of a public record falling under the Public and Private Writings Act has the initial duty to make a determination as to whether a specific requested record can be justifiably withheld.[18] However, that initial determination does not mean the information can

---

**10.** *See, e.g., Conover v. Board of Educ.,* 1 Utah 2d 375, 267 P.2d 768 (1954).

**11.** 65 Cal.2d 666, 56 Cal.Rptr. 265, 423 P.2d 193 (1967).

**12.** California Code of Civil Procedure, § 1892, provided:
"Every citizen has a right to inspect and take a copy of any public writing of this State, except as otherwise expressly provided by statute."
This statute was amended in 1968. The new act, the California Public Records Act, Gov. Code, § 6250, *et seq.,* was modeled on the federal Freedom of Information Act, 81 Stat. 54. *See also,* ORS 192.010.

**13.** *Supra* n. 11, at 675, 56 Cal.Rptr. at 271, 423 P.2d at 199. *See also Craemer v. Superior Court,* 265 Cal.App.2d 216, 71 Cal.Rptr. 193 (1968), and cases cited therein; *MacEwan v. Holm,* 226 Or. 27, 359 P.2d 413 (1961).

**14.** *See Moorehead v. Arnold,* 130 Ariz. 503, 637 P.2d 305 (1981).

**15.** *State ex rel. Newsome v. Alarid,* 90 N.M. 790, 568 P.2d 1236 (1977).

**16.** *Alarid, supra* n. 15; *Papadopoulos v. State Bd. of Higher Educ.,* 8 Or.App. 445, 494 P.2d 260 (1972).

**17.** *Alarid, supra* n. 15, at 1244.

**18.** *Alarid, supra* n. 15.

in fact be withdrawn. The burden is on the custodian to justify why the record sought should not be furnished.[19]

On appeal of a custodian's decision, it is then up to the court to "determine whether the explanation of the custodian is reasonable and to weigh the benefits to be derived from non-disclosure against the harm which may result if the records are not made available." [20]

The Supreme Courts of Arizona and Wisconsin have suggested procedures for their courts to follow when faced with the necessity of determining whether a public record can justifiably be denied release.

In *Mathews v. Pyle*,[21] the Arizona Supreme Court established this procedure:

> [The trial court should] require the ... documents ... in question to be produced in court for the private examination of the trial judge in order that the court may determine whether such ... documents are confidential and privileged or whether their disclosure would be detrimental to the best interests of the state. In no other way can such questions be determined.[22]

In *State ex rel. Youmans v. Owens*,[23] the Supreme Court of Wisconsin established the following procedure:

> [T]he proper procedure is for the trial judge to examine *in camera* the record or document sought to be inspected. Upon making such *in camera* examination, the trial judge should then make his determination of whether or not the harm likely to result to the public interest by permitting the inspection outweighs the benefit to be gained by granting inspection. [Footnote omitted.]

In reaching a determination so based upon a balancing of the interests involved, the trial judge must ever bear in mind that public policy favors the right of inspection of public records and documents, and, it is only in the exceptional case that inspection should be denied.... If ... disclosure of only a portion [of a record] is found to be prejudicial to the public interest, the trial judge has the power to direct such portion to be taped over before granting inspection.[24]

■ We subscribe to the foregoing procedures. Therefore, the case must be remanded to the district court for an *in camera* inspection of the questionnaires. The trial court should permit release unless it specifically finds, on the basis of its examination, that it is impossible to edit the questionnaire responses to preserve confidentiality and/or that release of the documents in whole or in part would be clearly contrary to the public interest. In making this determination, it is important to keep in mind that public policy favors free access to public records.

The case is remanded to the district court for findings in accordance with this opinion. No costs awarded.

STEWART and DURHAM, JJ., concur.

HOWE, Justice (dissenting):

I dissent. Writings or responses of students in the public schools can in no wise be termed "public records" since the students do not transact "public business" with the state or any of its agencies or subdivisions.

ZIMMERMAN, J., does not participate herein.

19. *MacEwan, supra* n. 13; *see also Alarid, supra* n. 15.

20. *Alarid, supra* n. 15, at 1244.

21. 75 Ariz. 76, 251 P.2d 893 (1952).

22. *Id.* at 81, 251 P.2d at 896–97.

23. 28 Wis.2d 672, 137 N.W.2d 470 (1965), *opinion modified on denial of rehearing,* 28 Wis.2d 672, 139 N.W.2d 241 (1966).

24. *Id.* at 682–83, 137 N.W.2d at 475; *see also Newspapers, Inc. v. Breier,* 89 Wis.2d 417, 279 N.W.2d 179 (1979); *Sheridan Newspapers, Inc. v. City of Sheridan, Wyo.,* 660 P.2d 785 (1983).