638 So.2d 853 (1994)
The BIRMINGHAM NEWS COMPANY
v.
William V. MUSE.
William V. MUSE
v.
The BIRMINGHAM NEWS COMPANY.
1921325, 1921937.
Supreme Court of Alabama.
March 18, 1994.
*854 James C. Barton, Gilbert F. Johnston, Jr. and Hollinger F. Barnard of Johnston, Barton, Proctor, Swedlaw & Naff, Birmingham, for The Birmingham News Co.
Thomas D. Samford III, General Counsel, Auburn University, T.W. Thagard, Jr. and Cynthia A. Holland of Balch & Bingham, Montgomery, and John P. Scott of Balch & Bingham, Birmingham, for William V. Muse.
PER CURIAM.
The Birmingham News Company filed an action against Dr. William V. Muse, president of Auburn University, seeking preliminary and permanent injunctions ordering Dr. Muse to cease and desist from denying access to Auburn University's response to a letter of official inquiry from the National Collegiate Athletic Association ("the NCAA"). The trial court denied a preliminary injunction, because the NCAA had not yet issued a final ruling on the matter, and the News appealed (# 1921325). The court later issued a permanent injunction, and Dr. Muse appealed (# 1921937). The issue is whether Auburn's response to the NCAA inquiry is a public writing subject to inspection and copying pursuant to Ala.Code 1975, § 36-12-40.
Because the trial court entered a permanent injunction granting the News the relief it requested, the appeal from the earlier denial of a preliminary injunction is moot and will be dismissed. The News argues that its appeal is not moot because, it says, the timeliness of the release of the documents is significant, but any decision we might render would not result in an enforceable judgment. The only judgment now capable of having any effect is the permanent injunction, and we decline to express an advisory opinion on the preliminary injunction under the circumstances of this case.
Section 36-12-40 reads, in pertinent part:
"Every citizen has a right to inspect and take a copy of any public writing of this state, except as otherwise expressly provided by statute."
In Stone v. Consolidated Publishing Co., 404 So.2d 678, 680 (Ala.1981), this Court rejected the argument that § 36-12-40 applies only to "such public records as are required by law to be kept by public officials. Code 1975, § 41-13-1." (Emphasis in original.) Instead, the Court held that it applies to "such a record as is reasonably necessary to record the business and activities required to be done or carried on by a public officer so that the status and condition of such business and activities can be known by our citizens." 404 So.2d at 681 (emphasis in original). The Court then said:
"This is not to say, however, that any time a public official keeps a record, though not required by law, it falls within the purview of § 36-12-40.... It would be helpful for the legislative department to provide the limitations by statute as some states have done. Absent legislative action, however, the judiciary must apply the rule of reason..... Recorded information received by a public officer in confidence, sensitive personnel records, pending criminal investigations, and records the disclosure of which would be detrimental to the best interests of the public are some of the areas which may not be subject to public disclosure. Courts must balance the interest of the citizens in knowing what their public officers are doing in the discharge of public duties against the interest of the general public in having the business of government carried on efficiently and without undue interference."
404 So.2d at 681 (citations omitted; emphasis added). The Court in Stone reversed the summary judgment for the publishing company that sought access and remanded for the trial court to consider whether the records met the test for public disclosure as set out in Stone.
Dr. Muse argues that this balancing to determine whether documents are subject to disclosure requires a factual finding as to each document. The News complains that Dr. Muse did not request in camera inspection for nondisclosure or redaction of particular documents until the second hearing, during which the court indicated that it would order the entire response disclosed. However, Dr. Muse responds with the statement *855 that Auburn requested in camera review at the first hearing, but that the judge declined to review the documents in detail, having decided to deny immediate relief. The second hearing was prompted by Auburn's objection to the trial court's order that the sealed record be sent to this Court, and during that hearing Dr. Muse requested full review in camera. It appears that the court ordered full disclosure and denied the request for in camera review because it was deferring to this Court because of the earlier appeal from the denial of the preliminary injunction.
When a legitimate argument for nondisclosure is made, a factual determination as to which documents should be disclosed and which should not should ordinarily be made in the first instance by the trial court. But for the preliminary appeal to this Court, the trial court presumably would have engaged in such a review. Furthermore, because Stone contemplates a fact-based decision on disclosure, a denial of a request for nondisclosure made without first undertaking such a review would seem to be error.
One of the cases relied on in Stone was State ex rel. Newsome v. Alarid, 90 N.M. 790, 568 P.2d 1236 (1977). Newsome, a student reporter for the University of New Mexico, wanted access to the nonacademic staff personnel records of the University. The Supreme Court of New Mexico held that an in camera review was required to balance the interests in favor of disclosure against the interests in favor of confidentiality. The court applied several statutory exemptions to certain portions of the record and then considered arguments for nonstatutory exemptions. It set forth guidelines for determining confidentiality and remanded to the trial court for consideration as to disclosure of individual records. Thus, Newsome supports the principle of initial in camera review by the trial court.
As to the merits of Auburn's argument for nondisclosure, we note that "information received by a public officer in confidence" is the first category listed in Stone of records not required to be disclosed pursuant to § 36-12-40. However, the Court stated in Chambers v. Birmingham News Co., 552 So.2d 854, 856 (Ala.1989), "The exceptions set forth in Stone must be strictly construed...." Therefore, a claim of confidentiality must be grounded in the facts of the particular case.
The argument for confidentiality of the response to the NCAA investigation is strongly supported by the opinion of the Supreme Court of Kansas in Berst v. Chipman, 232 Kan. 180, 653 P.2d 107 (1982). Berst was a mandamus action seeking a protective order against disclosure of NCAA documents at its headquarters in Kansas. The documents pertained to its investigation into charges that the University of Alabama had broken NCAA rules while recruiting Bobby Lee Hurt from Butler High School. Hurt and the principal of Butler had sued the Birmingham Post Company (publisher of the Birmingham Post-Herald newspaper and hereinafter called "the Post-Herald") for libel, and the Post-Herald was seeking the documents to aid in making its defense, its defense being the contention that the articles it had published were true. The trial court allowed full disclosure, but the Supreme Court of Kansas allowed access only to "memoranda contain[ing] information directly relating to a central issue in the Alabama lawsuit, that of the truth or falsity of the information reported in the subject publications." 232 Kan. at 192-93, 653 P.2d at 117 (emphasis added). The Supreme Court of Kansas held that the trial court had erred in denying the motion without conducting an in camera review, 232 Kan. at 186-87, 653 P.2d at 113, but conducted its own review because of the exigency of the pending libel action in Alabama.
The following language from the Berst opinion supports Dr. Muse's argument for confidentiality and nondisclosure:
"Whether the petitioners have a protectable interest in maintaining the confidentiality of their private investigation into possible infractions of NCAA rules undoubtedly presents a legal question of significant public interest. Substantially affected are the privacy interests of those persons to whom information in the file relates or who have passed on information to the NCAA under a pledge of confidentiality, *856 as well as the NCAA's ability to perform one of its primary functions, that of policing its own ranks to prevent corruption in collegiate athletics....
"To fully appreciate the NCAA's high degree of interest in preserving the confidentiality of their investigation files and the identities of their sources, it is helpful to understand the self-policing function of the NCAA and how this system operates. Briefly, the NCAA is a voluntary organization composed of approximately 750 colleges and universities[[1]] throughout the United States. One of the primary duties of the NCAA is to enforce regulations governing the recruiting, admissions, financial aid, and academic standards aspects of collegiate athletics at member institutions.
"Investigations by the NCAA of possible rules infractions are conducted in the strictest of confidence pursuant to internal rules of the NCAA. It is undisputed that investigators must rely on confidential sources for much of their information. Generally, any information an investigator comes across during his inquiries is placed in the NCAA's confidential file on that investigation. In any one of the NCAA's investigation files there may be allegations and speculation about an individual's sexual preferences, mental capacity, drug and alcohol use, and financial condition; academic records of students, anonymous letters and memoranda of telephone calls, and internal memoranda of interviews which contain the investigator's mental impressions, speculations and conclusions.
"Once the NCAA verifies through an investigation that a possible infraction has occurred, a notice of the allegations is sent to the institution thought to be in violation. The institution then attempts to ascertain all relevant information from the principals involved, including coaches, student-athletes and employees, with much of this information being obtained by the institution under a pledge of secrecy. The college or university then prepares a response to the NCAA inquiry, which is also submitted under promises of confidentiality. All this information is placed in the NCAA's file on the investigation. Further action taken by the NCAA's Committee on Infractions may also be reflected in the file. Once a determination is made on the merits of an infractions case, and the case has been completed, a press release is issued by the NCAA disclosing only the institution involved and any sanctions imposed. All other information remains confidential.
"The NCAA maintains that its policy of confidentiality has been central to the success of this self-policing system in effect for the past 30 years. The NCAA strongly argues loss of this confidentiality will destroy the system, causing intercollegiate athletics to suffer. Because of the extent of national interest and involvement in intercollegiate athletics, the NCAA asserts there is a strong public interest in preserving the means by which the NCAA can investigate and supervise the area of college level sports, which outweighs the petitioners' interest in obtaining the information sought for their defense in the libel action. Furthermore, the NCAA is concerned about potential harm to innocent persons not parties to the Alabama lawsuit, who either disclosed information contained in the file or about whom the information relates."
232 Kan. at 183-85, 653 P.2d at 111-12 (emphasis added).
Dr. Muse makes the point that Auburn does not have power to subpoena witnesses for information regarding alleged NCAA rule violations and from that point argues that the promise of confidentiality is an important part of Auburn's power to cooperate with the NCAA in the investigation. He states that virtually all of the witnesses were promised confidentiality before giving Auburn information to use in its response.[2]
*857 In cooperating with or responding to the NCAA's investigation, Auburn is functioning as a member of a voluntary, self-policing institution. When that institution's rules require confidentiality of its investigations, it is reasonable to maintain that confidentiality to the extent compatible with the fact that some of its members are public institutions. Certainly, a private college or university's response to an NCAA investigation would be strictly confidential. Although Auburn University is a state institution, its response does not necessarily become a public record subject to disclosure simply because of that fact.
The News cites no law requiring Auburn to respond to NCAA inquiries or investigations, so there is no showing that its response is a public record as a matter of law. Thus, in applying Stone`s "rule of reason," to determine whether the response and supporting documents are public records subject to disclosure, the confidentiality inherent in the investigation should be honored unless it is overcome by a compelling interest weighing in favor of disclosure. The Berst court cited the NCAA's assertion that there is a "strong public interest in preserving the means by which the NCAA can investigate and supervise the area of college level sports." The Supreme Court of Kansas did not expressly adopt this position, but its discussion indicated that it considered the public interest to weigh against disclosure. It weighed the interest of the Post-Herald as a private litigant against that public interest. Finding that the investigation included information crucial to the Post-Herald's defense, it ordered production only to the extent required by the Post-Herald's need for information strictly pertinent to its defense of truth.
The position of the Supreme Court of Kansas corresponds to an analogous principle in cases decided by this Court. In regard to questions of eligibility to participate in high school athletics, this Court has said that trial courts ordinarily should not interfere. Such questions are decided in this state by the Alabama High School Athletic Association, "a voluntary organization compris[ing] 656 public and private schools." Alabama High School Athletic Ass'n v. Scaffidi, 564 So.2d 910, 911 (Ala.1990).
"In Scott v. Kilpatrick, 286 Ala. 129, 237 So.2d 652 (1970), we set forth the standard of review regarding a court's jurisdiction in a high school athletic association's determination of the eligibility of amateur athletes:
"`If officials of a school desire to associate with other schools and prescribe conditions of eligibility for students who are to become members of the school's athletic teams, and the member schools vest final enforcement of the association's rules in boards of control, then a court should not interfere in such internal operation of the affairs of the association....
"`Of course, if the acts of an association are the result of fraud, lack of jurisdiction, collusion, or arbitrariness, the courts will intervene to protect an injured [party's] rights."
"286 Ala. at 132, 237 So.2d at 655 (citations omitted) (emphasis added)."
564 So.2d at 912; see also Alabama High School Athletic Ass'n v. Medders, 456 So.2d 284 (Ala.1984); Alabama High School Athletic Ass'n v. Rose, 446 So.2d 1 (Ala.1984).
Thus, this Court has recognized and generally deferred to the self-policing association instituted by the public schools of Alabama. The NCAA is similarly instituted by and among the nation's colleges and universities, many of which are public institutions. Our cases declining to interfere with regular proceedings of the Alabama High School Athletic Association support a similar recognition of the NCAA's policy of confidentiality in its investigations. The recognition of this policy supports the public's interest in maintaining Alabama's state colleges and universities as members of the national collegiate athletic community.
We do not necessarily say that the public interest weighs only in favor of the NCAA's policy of confidentiality in its system for the self-policing of college athletics. The public has an interest in ensuring that its public institutions are run properly. However, that interest can be protected by proceedings other than an NCAA investigation or the college's response thereto. Because the documents *858 at issue here were generated solely as part of Auburn's response to the NCAA investigation, and because such investigations are conducted under promises and policies of confidentiality that are helpful, or even necessary, to such investigations, the court, before ordering that any portion of the response be disclosed, should duly consider the promise and the policy of confidentiality in deciding whether each document should be disclosed.
The Justices concurring in the result and dissenting cite University of Kentucky v. Courier-Journal & Louisville Times Co., 830 S.W.2d 373 (Ky.1992), and Memphis Publishing Co. v. Memphis State University, 6 Media L.Rep. (BNA) 2405 (Tenn.App.1980) (not published in S.W.2d). The holdings in those cases are not pertinent to our decision because both courts were construing specific statutory exemptions. The Supreme Court of Kentucky considered four specific statutory exemptions and held that none applied; the Tennessee Court of Appeals considered a statutory exemption for "records of students... relating to academic performance, financial status ..., [or] medical or psychological treatment," and held that it did not apply. This Court in Stone invited the Alabama Legislature to enact such statutory exemptions, but the Legislature has not done so. Therefore, Auburn's reliance on the general exemption stated in Stone for "information received by a public official in confidence" is reasonable, and this Court will not apply the statutory law of other states to conclude that no exemption may be applied in this case.
At the hearing on the request for a preliminary injunction, the trial judge apparently reviewed the response and some of the supporting materials. However, at the hearing on the permanent injunction, the judge acknowledged that he had "not read all of the statements and [had] not look[ed] at all the supporting documents." Therefore, the trial judge has ordered the disclosure of some documents that it has not reviewed. Furthermore, he has not made individualized determinations as to whether the response and the supporting materials are due to be disclosed under the standards set out in Stone, Chambers, and this opinion. These matters should be addressed first by the trial judge. Therefore, the cause must be remanded for an in camera review and a determination by the trial judge.
1921325DISMISSED AS MOOT.
1921937REMANDED.
HORNSBY, C.J., and ALMON, SHORES, STEAGALL, INGRAM and COOK, JJ., concur.
MADDOX, J., concurs in the result.
HOUSTON, J., concurs in part and dissents in part.
MADDOX, Justice (concurring in the result).
It is somewhat difficult for me to understand why the Birmingham News Company is not entitled to see what Justice Houston believes it is entitled to see. I was almost persuaded to concur with his special writing, but I concur in the result, which is to remand the case to the trial court: (1) because the trial judge acknowledged that he had "not read all of the statements and [had] not look[ed] at all the supporting documents," and (2) because I believe that Auburn University should be given another opportunity, if it can, to show why the records should not be disclosed.
In concurring to remand the case for this purpose, I must point out, however, that I agree with Justice Houston's position on the applicable law, and specifically with his statement that "[his] position in this case is consistent with two recent rulings by appellate courts in Kentucky and Tennessee," University of Kentucky v. Courier-Journal & Louisville Times Co., 830 S.W.2d 373 (Ky. 1992); Memphis Publishing Co. v. Memphis State University, 6 Media L.Rep. (BNA) 2405 (Tenn.App.1980) (not published in S.W.2d).
HOUSTON, Justice (concurring in part and dissenting in part).
I concur with the majority opinion insofar as it holds that the appeal by the Birmingham News Company is moot and, therefore, due to be dismissed. The overriding issue in both of these appeals is whether Auburn's *859 refusal to make its response available to the News violated Alabama's "Open Records Act," Ala.Code 1975, § 36-12-40. However, the trial court ultimately ordered Auburn to disclose its response. I note the News's contention that its appeal was not rendered moot by the trial court's ultimate ruling in its favor. The News urges us to hold that Auburn should have made its response public when it was first asked to. Stated differently, the News takes the position that it is entitled to both an affirmance of the judgment granting its requested injunctive relief and a holding that the trial court abused its discretion in not entering the injunction earlier. However, given the procedural posture of this case, our resolution of this issue would amount to nothing more than an advisory opinion. I do note, however, that I would not be inclined to find an abuse of discretion on the trial court's part in waiting until after the NCAA investigation had been completed to order the release of the response.
I respectfully dissent from that portion of the majority opinion reversing in toto the trial court's permanent injunction and remanding the case for further consideration. Relying on Stone v. Consolidated Publishing Co., 404 So.2d 678 (Ala.1981), and Chambers v. Birmingham News Co., 552 So.2d 854 (Ala.1989), Auburn contends that its response contains statements of a sensitive and personal nature from individuals who were told by investigators representing the NCAA and Auburn that the investigation into Auburn's football program would be kept confidential. Making the response public, Auburn argues, would breach the promises of confidentiality that it says were made to these individuals and would jeopardize Auburn's ability to conduct future internal investigations into alleged improprieties within its athletic program. Maintaining that the trial court did not conduct a thorough in camera examination of all of the documents comprised in the response, Auburn seeks a reversal of the permanent injunction and a remand of the case for further consideration after all of the documents have been examined by the trial court.
Also relying on Stone and Chambers, the News contends that Auburn failed to overcome the strong presumption in favor of the disclosure of public records under § 36-12-40. The News argues that when the interest of the taxpayers in knowing what information their public officials have gathered during a major investigation of alleged improprieties at one of their state universities is balanced against that university's desire to keep the results of that investigation secret, the taxpayers' interest in full disclosure must prevail.
Section 36-12-40 provides in pertinent part:
"Every citizen has a right to inspect and take a copy of any public writing of this state, except as otherwise expressly provided by statute."
In Chambers, we stated:
"In Stone, supra, we held that a `public writing,' as encompassed by § 36-12-40, is a record `reasonably necessary to record' the required business and activities of a public officer `so that the status and condition of such business and activities can be known by our citizens,' and we recognized that the news media are `clearly appropriate vehicles' through which the citizens of this state can be informed of the business and activities of the public officials. We then wrote:
"`This is not to say, however, that any time a public official keeps a record, though not required by law, it falls within the purview of § 36-12-40. McMahan v. Trustees of the University of Arkansas, 255 Ark. 108, 499 S.W.2d 56 (1973). It would be helpful for the legislative department to provide the limitations by statute as some states have done. Absent legislative action, however, the judiciary must apply the rule of reason. State v. Alarid, 90 N.M. 790, 568 P.2d 1236 (1977). Recorded information received by a public officer in confidence, sensitive personnel records, pending criminal investigations, and records the disclosure of which would be detrimental to the best interests of the public are some of the areas which may not be subject to public disclosure. Courts must balance the interest of the citizens in knowing what their public *860 officers are doing in the discharge of public duties against the interest of the general public in having the business of government carried on efficiently and without undue interference. MacEwan v. Holm, 226 Or. 27, 359 P.2d 413 (1961).'
"Stone, 404 So.2d at 681. Additionally, § 36-12-40 states, in pertinent part, that `every citizen has a right to inspect and take a copy of any public writing of this state.'
"We have paid particular attention to the language in Stone that seeks to prescribe exceptions to the public disclosure requirement of public writings and records, together with the language in § 36-12-40. It is clear from the wording of § 36-12-40 that the legislature intended that the statute be liberally construed. In addition, we note, statutes intended for the public benefit are to be construed in favor of the public. Gant v. Warr, 286 Ala. 387, 240 So.2d 353 (1970).
"To put the Stone `exception' language into perspective, along with the language of § 36-12-40, we offer the following guidance. There is a presumption in favor of public disclosure of public writings and records expressed in the language of § 36-12-40. Limitations to the broad language of the statute are, nevertheless, necessary, and, as stated in Stone, absent legislative action, the judiciary has to apply the `rule of reason.' However, it must be noted that this `rule of reason' shall not be applied so as to hamper the liberal construction of § 36-12-40. The exceptions set forth in Stone must be strictly construed and must be applied only in those cases where it is readily apparent that disclosure will result in undue harm or embarrassment to an individual, or where the public interest will clearly be adversely affected, when weighed against the public policy considerations suggesting disclosure. These questions, of course, are factual in nature and are for the trial judge to resolve. Moreover, the Stone exceptions should not come into play merely because of some perceived necessity on the part of a public official or established office policy. Furthermore, because there is a presumption of required disclosure, the party refusing disclosure shall have the burden of proving that the writings or records sought are within an exception and warrant nondisclosure of them.
"Doubtless, exceptions to the broad language of § 36-12-40 are needed and should be applied under appropriate circumstances. But, we emphasize that these exceptions must be narrowly construed and their application limited to the circumstances stated herein, for it is the general rule, and has been the policy of this state for a number of years, to advocate open government. The Stone exceptions were not intended, nor shall they be used, as an avenue for public officials to pick and choose what they believe the public should be made aware of."
552 So.2d at 856-57.
I have carefully examined Auburn's response, which contains, among other things, the statements of a number of individuals taken during the investigation. These statements provide great insight into what eventually became one of the most highly publicized NCAA investigations into alleged improprieties at an Alabama state university. After carefully examining the contents of Auburn's response, I have concluded that these statements, while containing information that the citizens of this state may find interesting in a general sense, also contain certain information that the citizens of this state need to know and have a right to know. In reaching this conclusion, I recognize Auburn's concern for the confidentiality of the investigatory process and the effectiveness of future internal investigations by Auburn. I realize that Auburn had no subpoena power to aid it in its attempt to gather information and that it relied heavily on the voluntary cooperation of witnesses. My decision in this case, however, is predicated on the fact that all but two of the statements of confidentiality made by investigators from the NCAA and Auburn during the interviews were general in nature and did not promise confidentiality based upon the specific request of any individual. There is no indication in any of the statements contained in the response, other than the statements of Larry Blakeney, who was an employee of Troy State University at the *861 time of his interview, and Buddy Mitchell, who at the time of his interview was not an employee of Auburn, that any individual questioned specifically solicited a promise of confidentiality and agreed to talk only after such a promise was made. It would run counter to my understanding of the legislature's intent in enacting § 36-12-40 for me to hold that a general assurance of confidentiality could nullify the statute. In this regard, I find persuasive the approach taken by the Supreme Court of Utah:
"The Board contends that the promise of confidentiality made at the top of each form is sufficient to preclude disclosure of the forms. The promise only, however, is not sufficient. If this Court allowed a promise of confidentiality to end the inquiry, any state official could eliminate the public's rights under the Public and Private Writings Act. This is not an acceptable result. Breach of a promise of confidentiality standing alone is not of sufficient harm to the public's interest to prevent disclosure. In this situation, as in others, promises of confidentiality cannot always be kept. The promise would have to coincide with reasonable justification based on public policy for refusing to release the records."
KUTV, Inc. v. Utah State Board of Education, 689 P.2d 1357, 1361 (Utah 1984). See, also, Dale v. Birmingham News Co., 452 So.2d 1321 (Ala.1984); Moorehead v. Arnold, 130 Ariz. 503, 637 P.2d 305 (App.1981); State ex rel. Newsome v. Alarid, 90 N.M. 790, 568 P.2d 1236 (1977). Given the strong presumption in favor of the public's right to have access to public records, the law should not presume that an individual would not disclose information in the absence of such a general assurance of confidentiality. I reiterate, however, that information or statements given upon promises of confidentiality that are solicited on the record by the individuals sought to be questioned in investigations of this kind and that form the sole basis for the individual's cooperation may be protected from disclosure. An exception for recorded information received by a public official in confidence under these circumstances would serve to protect the integrity of the investigatory process and would provide a reasonable justification based on sound public policy for refusing to release the records.[3]
I suppose that my strong feelings in favor of preserving the sanctity of the taxpayers' right to know what goes on in, or what is done to, institutions supported by their tax money prevent me from truly understanding what our decision in this case has to do with our previous decisions dealing with the appropriate judicial standard for reviewing a high school athletic association's determination of the eligibility of amateur athletes. I do not interpret those decisions as requiring a "hands off" approach by this Court in cases where the public's right to know under § 36-12-40 is challenged. Likewise, I understand that cases of this kind present factual questions as to whether disclosure will result in undue harm or embarrassment to an individual or whether the public's interest will be adversely affected, when weighed against the *862 public policy considerations suggesting disclosure, and that those questions are normally for the trial court to resolve. However, given the lengthiness of this litigation to date (and the corresponding length of time that the public has been denied access to this information), I simply cannot justify a remand. Each Justice on this Court is capable of carefully examining Auburn's response, as I have, and each is capable of making a determination as to whether all of the response, or part of it, should be made public. Presumably this will have to be done anyway when this case returns to us after a ruling on remand, and I note that it will have to be done without any presumption of correctness as to the trial court's judgment.
I would hold, therefore, that Auburn's response to the NCAA investigation should be made available for inspection by the News, with the exception of the statements given by Buddy Mitchell and Larry Blakeney and any information contained in the response to allegation number 2 in the last paragraph on page 36 through the first paragraph on page 44, and any information contained in the response to allegation number 7 in the second and third sentences on page 144, and such other responses to the official inquiry that could have been derived only from the testimony of Larry Blakeney. I note that my position in this case is consistent with two recent rulings by appellate courts in Kentucky and Tennessee. See University of Kentucky v. Courier-Journal & Louisville Times Co., 830 S.W.2d 373 (Ky.1992), and Memphis Publishing Co. v. Memphis State University, 6 Media L.Rep. (BNA) 2405 (Tenn.App.1980) (not published in S.W.2d).
I think that the majority opinion conflicts with both the legislative intent in enacting § 36-12-40 and the prior decisions of this Court defining that legislative intent. In a democracy, public records should be open. Openness should be the lodestar. To mix words and thoughts from Justice Oliver Wendell Holmes's dissents in Truax v. Corrigan, 257 U.S. 312, 344, 42 S.Ct. 124, 133-34, 66 L.Ed. 254 (1921), and Abrams v. United States, 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (1919), and an 1865 letter from Holmes to Henry Brownell; there is nothing that I more deprecate than the use of judicial power to keep people ignorant and thereby thwart their search for truth. "Truth sifts so slowly from the dust of the law."
NOTES
[1] Auburn is a member of the NCAA.
[2] The dissent's position that confidentiality exists only when the witness expressly insisted on it ignores the fact that Auburn promised confidentiality to all or virtually all witnesses as an inherent part of the entire investigation. We see no reason why a witness should be required to insist that Auburn repeat a promise that it has already given.
[3] Larry Blakeney's attorney made the following statement on Blakeney's behalf before Blakeney was interviewed:

"Also, I want it to be made very clear to everyone here that everything that occurs in this room today is confidential, and I just want to be sure everybody understands that. That this is not to be discussed with anyone. It is in no way to be disseminated to anyone. It is in no way to be commented [on] to the press by anyone. And if anyone has any idea contrary to that, then they need to speak up, because we need to resolve that problem."
Blakeney's statement should not be subject to disclosure.
Before he was questioned, Buddy Mitchell submitted to Auburn's attorney a letter that contained a statement similar to the one Blakeney's attorney made:
"I've been requested to speak with one or more persons with the NCAA regarding allegations made by Eric Ramsey against Auburn University. I will agree to speak with you and the NCAA investigators regarding this matter under the following conditions:
"(a) My discussion will remain completely confidential.
"(b) That my statements or any part thereof will not be released to the public or the press without my prior written consent.
"(c) This confidentiality and written consent required extends not only to my statements but [also to] any notes which I may choose to share with the NCAA."
Mitchell's statement, like Blakeney's, should not be subject to disclosure.